**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Yellow Corporation, *et al.* | ) | Case Nos. 23-11069 (CTG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Response Deadline: Mar. 29, 2024 (by consent)** |
| | ) | |
| | ) | **Hearing Date: Apr. 11, 2024 @ 11:00 a.m.** |

**THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND TEAMSTERS
NATIONAL FREIGHT INDUSTRY NEGOTIATING COMMITTEE,
AND THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS' RESPONSE TO DEBTORS' THIRD OMNIBUS (SUBSTANTIVE),
FOURTH OMNIBUS (SUBSTANTIVE), AND FIFTH OMNIBUS (SUBSTANTIVE)
OBJECTIONS TO PROOFS OF CLAIM FOR WARN LIABILITY**

Creditor, The International Brotherhood of Teamsters ("IBT"), Teamsters National Freight Industry Negotiating Committee ("TNFINC"), its affiliated local unions, and their respective bargaining members[1], (collectively "Teamsters"), and Creditor, The International Association of Machinists and Aerospace Workers ("IAM"), and its affiliated district lodges, and their respective bargaining members[2], (collectively "Machinists"), by and through their undersigned counsel, submit this Response to *Debtors' Third Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, the *Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, and the *Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*. [D.I Nos. 2576-2578]. The Teamsters and Machinists are creditors in their capacity as the exclusive bargaining representatives of these employees, who are also creditors in

---

[1] The Teamsters filed proofs of claim on behalf of the approximately 21,000 Teamster affiliated former employees of Yellow Corporation's subsidiaries: YRC Inc., USF Holland, LLC, New Penn Motor Express, LLC and USF Reddaway Inc.

[2] The Machinists filed proofs of claim on behalf of approximately 150 Machinist affiliated former employees of Yellow Corporation's subsidiaries: YRC Inc., USF Holland, LLC, New Penn Motor Express, LLC and USF Reddaway Inc.

their own right. *U.S. Truck Co. v. Teamsters*, 89 B.R. 618, 621-623 (E.D. Mich. 1988) (holding that a labor union is the creditor which owns claims arising under the collective bargaining agreement); *See also In re Altair Airlines, Inc*., 727 F.2d 88 (3d Cir. 1984). The Teamsters have standing to bring WARN Act claims on behalf of bargaining unit members formerly employed by Yellow Corporation and its subsidiaries (collectively "Yellow", "Debtors" or "Companies"), for the benefit of those unit members. *See UFCW Union Local 751 v. Brown Grp., Inc.,* 517 U.S. 544, 549 (1996) *citing* 29 U.S.C. § 2104(a)(5). Insofar as individual Teamster or Machinist affiliated former employees of Yellow or Teamster or Machinist affiliated local unions filed claims that were included in the *Debtors' Third, Fourth, or Fifth Omnibus (Substantive) Objections to Proofs of Claim for WARN Liability*, the Teamsters and Machinists respond on those employees' and locals' behalf. Teamsters and Machinists ask that the unionized employees claims be allowed, except as needed to avoid duplicate recovery. In support of this Response, the Creditors rely on the declaration of John Murphy ("*Murphy Decl.*") filed contemporaneously herewith.

## INTRODUCTION

As the Debtors concede, they ordered mass layoffs on July 30, 2023, without first giving notice to employees of the likelihood of closure as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"). 29 U.S.C. § 2100 *et seq.* (1988). Because the Debtors, by their own admission, did not provide the required sixty-day notice of plant closing or mass layoff, and because the Debtors cannot meet the burden of proof as to the affirmative defenses, the unionized employees' (represented by the Teamsters and the Machinists) WARN Act claims should be allowed in their entirety as filed, with attorneys' fees and costs to the Teamsters and Machinists, except to the extent necessary to eliminate duplicate claims. The defenses to the WARN Act plead by the Debtors are affirmative in nature, i.e., the Debtors "bear[] the burden of

proof that conditions for the exceptions have been met." 20 C.F.R. § 639.9; *see also Washington v. Aircap Industries, Inc.*, 860 F.Supp. 307 (D. S.C. 1994).

*First*, the Debtors argue they were a "liquidating fiduciary" rather than an "employer" when they laid off their nearly 22,000 unionized employees without first having given notice and that therefore they cannot be held liable for a violation for the WARN Act which only holds "employers" liable. However, the Debtors were still a week away from filing for bankruptcy and were engaged in the ordinary course of business when they laid off their employees, definitionally qualifying as an employer under the WARN Act. 29 U.S.C. §2101(a)(1)(A).

*Second*, the Debtors cannot qualify as a faltering business as they have not and will not be able to show that they were seeking financing or refinancing during the critical period of May 28th to May 31st, 2023, exactly 60 days before terminating their workforce. *In re AE Liquidation, Inc.,* 522 B.R. 62, 67 (Bankr. D. Del., 2014).

*Third*, the Debtors cannot claim that the terminations were caused by unforeseen business circumstances, as the Debtors' purported WARN notice ("WARN Notice") was deficient on its face by failing to provide a brief statement of the basis for reducing the notification period as required by the WARN Act. The Debtors' WARN Notice fails to mention the 72-hour notice of default issued by Teamster local unions upon which they now riley; nor have they provided any reasonable explanation why they could not have foreseen the issuance of a notice of default when they deliberately defaulted on payment to Teamster affiliated health and welfare funds.

*Fourth*, the Debtors are not entitled to any reduction of liability based on good faith, as the Debtors have not and will not be able to provide evidence that the wholesale lack of notice was objectively reasonable. *See In re Jamesway Corp.*, 235 B.R. 329, 345 (Bankr. S.D. N.Y. 1999).

*Fifth*, the State WARN Act claims should be resolved along with the Federal Warn Act claims, which materially share a basis for liability and defense.

Finally, responses below are subject to the discovery and pre-trial procedures applicable in adversary proceedings. Fed. R. Bankr. P. 9014(c); Fed. R. Civ. P. 26. This Court is currently considering class certification in *Moore, et al. v. Yellow Corp., et al.*, Adv. Pro. No. 23-50457 (CTG) (Bankr. D. Del. 2023), wherein the proposed class representatives, also terminated by the Debtor without notice, seek to represent a class of non-bargaining unit employees on their WARN claims. The *Moore* class certification motion is scheduled for a hearing on April 11, 2024. If certified, the *Moore* adversary proceeding, along with the Teamster and Machinist contested matters would represent all WARN Act claimants in this bankruptcy. Because both this contested matter and the Moore adversary proceeding arise from the same core of operational facts, this matter should be continued to allow the Teamsters/Machinist/*Moore* parties the opportunity to establish a consensual scheduling order with Debtors to try all WARN Act claims together. While Teamsters and Machinists are aware of one other WARN Act adversary (i.e., *Coughlen, et al. v. Yellow Corp., et al.*, Adv. Pro. No. 23-50761 (CTG) (Bankr. D. Del. 2023)) each of the named plaintiffs in that matter are Teamsters bargaining unit members for whom the Teamsters have asserted WARN claims and whose interests are already protected.

## BACKGROUND

For several decades, Yellow has struggled to run a competitive trucking company. *Murphy Decl.*, at ¶¶8-18. Throughout these years of struggle, the Debtors have repeatedly come to their unionized employees asking for concessions in order to avoid total collapse. *Id*.

On several occasions, the Debtors received help in the form of investments from private and public lenders, yet Yellow always seemed to return to its employees asking for additional

concessions no matter the influx of capital it received from outside sources. *Id*; *Murphy Decl*. at ¶ 32. In particular, the Debtors received $700,000,000.00 from the United States Treasury in 2020. *Murphy Decl.*, at ¶ 20. The Teamsters hoped that this would put the Companies on stable ground and allow for some gains to be made for employees in the future. *Id*. Yet, just two short years later, the Debtors were again apparently at the brink of collapse. *Murphy Decl.*, at ¶ ¶39-42.

In 2022, the Companies underwent a significant change in operations in the western region. *Murphy Decl.*, at ¶25. The Teamsters worked with Yellow regarding these changes—ensuring the contract governing employee labor was adhered to and employees were not taken advantage of in the process. *Id*. In late 2022, Yellow began the process of further changes, this time involving the central, east, and southern regions, and the changes being far more extensive than the previous changes. *Murphy Decl.*, at ¶ 26. TNFINC, a negotiating committee comprised of representatives of Teamster local unions which has authority to negotiate a contract on behalf of the local unions with the Companies, informed Yellow's management that a change of operations process cannot be used to subvert or avoid the collective bargaining agreement governing Teamster employees. *Murphy Decl.*, at ¶¶2-4, 32. As early as November 2022, the Teamsters warned Yellow that the union would not agree to changes in operations that violated the contract. *Murphy Decl.*, at ¶29.

Yellow continued to pursue its changes despite the Teamsters frequent and clear objections, *Murphy Decl.*, at ¶¶29, 32-37, until April 2023, when the Teamsters described to Yellow its two discrete options: 1) either propose changes that do not violate the contract, or 2) open up the contract early and allow two-way bargaining as the parties do in a contract renewal year. *Murphy Decl.*, at ¶38. Eventually Yellow chose the latter path, asking to reopen the contract with the Teamsters. *Murphy Decl.*, at ¶39, 41. While the Teamsters, busy with two large scale negotiations that spring and summer, asked that the re-opener negotiations take place in August 2023, *Murphy*

*Decl.*, at ¶41, the Companies stated August would be too late given the Companies' financial situation, and that the re-opener had to happen immediately. *Id*; D.I. 2581, ("*Hawkins Decl.*") at ¶57. After some negotiation that spring, Mr. Bryan Reifsnyder, then Senior Vice President of Trucker Relations at Yellow, sent a message to Mr. John Murphy, the National Freight Director the Teamsters, asking that the union agree to an attached letter of understanding. *Murphy Decl.*, at ¶42. Within the message to Mr. Murphy, Mr. Reifsnyder states in no uncertain terms that Yellow is unable to garner financing or refinancing due to its poor financial state. *Id*. Mr. Reifsnyder stated that Yellow needed a framework agreement with the Teamsters in order to gain "bridge" financing. *Id*. Mr. Murphy responded on behalf of TNFINC on June 5, 2023, that the Teamster local unions would not accept the Letter of Agreement proposed by Mr. Reifsnyder because of the largescale concessions requested with minimal and contingent promise of economic benefit to the employees. *Murphy Decl.*, at ¶ 43.

Soon after, in June 2023, Yellow requested to defer payments to Teamster affiliated health and welfare funds ("Funds") but was denied its requests by the Funds involved. *Murphy Decl.*, at ¶44; *Hawkins Decl.*, at ¶72. Whether or not to enter a deferral agreement with an employer is the Funds' decision to make, as they are a separate entity from the IBT, TNFINC, and the local unions. *Murphy Decl.*, at ¶44. Despite being denied the request, Yellow chose to default on payments to several Funds in early July 2023. *Murphy Decl.*, at ¶46; *Hawkins Decl.*, at ¶80.

On July 17, 2023, the Teamsters received a letter from the Central States Southeast and Southwest Areas Health and Welfare Fund ("Central States") noting that because Yellow defaulted on payment, Central States would terminate Yellow's participation in the fund effective July 23, 2023. *Murphy Decl.*, at ¶47. The Teamsters, understanding that Yellow's failure to remit payment to Central States would result in 11,000 Teamster families without health care, *Murphy Decl.*, at

¶48, issued a 72-hour notice of default ("Default Notice") to the Company. *Murphy Decl.*, at ¶¶49-50. A Default Notice informs an employer that the affiliated local unions may pursue a work stoppage beginning 72 hours after sending the Default Notice unless the company cures the stated default. *Id.*

While the Default Notice had the effect of bringing both the Company and the Teamsters back to the negotiating table, eventually garnering a deferral from Central States of Yellow's health and welfare payments, the Company still chose to terminate its entire unionized workforce during the week of July 24, 2023. *Murphy Decl.*, at ¶¶ 52-56; *Hawkins Decl.*, at ¶¶100, 108. At no point were employees warned of the likelihood of a mass layoff, and only after terminating all unionized employees did the Teamsters and the Machinists receive a letter from the Company claiming to satisfy the WARN Act notice requirements. *Id.*

## ARGUMENT

**I.      The Debtors Are Liable Under The WARN Act Because They Were An Employer Rather Than A Liquidating Fiduciary.**

   *A.      The Debtors Cannot Be A Liquidating Fiduciary For WARN Act Violations That Occurred Before They Filed For Bankruptcy Protection.*

1.      The Debtors terminated their unionized employees (represented by the Teamsters and represented by the Machinists) on July 30, 2023. *Hawkins Decl.* at ¶108. The Debtors belatedly provided a purported WARN Notice to the Teamsters and the Machinists also dated July 30, 2023.[3] D.I. 2576 ("*Third Objection*") at ¶50; *Murphy Decl.* at ¶56. The Debtors did not file their bankruptcy petition with the Bankruptcy Court until August 6, 2023 ("Petition Date"). [D.I. 1].

2.      An employer subject to the WARN Act is any entity that employs at least 100 persons. 29 U.S.C. §2101(a)(1)(A). Because the Debtors employed more than 100 persons on July

---

[3] The purported WARN Notice received by both the Teamsters and the Machinists are identical save for the address.

30, 2023, they were an employer within the meaning of the statute. The liquidating fiduciary exception applies only if the entity that terminated the employees is a fiduciary in the bankruptcy proceeding. *In re Century City Doctors Hosp., LLC*, 2010 WL 6452903 n. 9 (B.A.P. 9th Cir. 2010) (If the employer's management rather than the chapter 7 trustee made the decision to terminate employees pre-petition, then any WARN Act liability arising from the terminations is attributable to the employer, not the chapter 7 trustee). Since the Debtors were neither Debtors in possession nor a fiduciary on July 30, 2023, whether it was an employer on that date depends on the plain language of the statute. A determination otherwise would allow any business to avoid WARN Act liability by filing for bankruptcy immediately after terminating employees.

3.    The Third Circuit's discussion in *In re United Healthcare* supports the same conclusion. The Court stated that if the actions of a Debtors in possession, as a fiduciary in bankruptcy, resemble those of a business winding up its affairs, the *Debtors in possession* are not an employer within the meaning of the WARN Act. *See* 200 F. 3d at, 170, 177-178 (D. NJ. 1999). The analysis focuses on whether an employer as fiduciary succeeded to WARN Act obligations. *See* 200 F. 3d at 179. The liquidating fiduciary exception therefore requires the decision to be made by either a bankruptcy trustee, or by Debtors in possession who owes similar fiduciary duties to creditors. *Commodity Future Trading Com'n v. Weintraub*, 471 U.S. 343, 355 (1985). (If a bankruptcy trustee is not appointed, the directors of a Debtors that remains in possession bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a Debtors out of possession). Because in *United Healthcare* the termination decision was made by a Debtors in possession, the case does not stand for the proposition an employer can take advantage of the liquidating fiduciary exception for employee terminations that occurred before it filed for bankruptcy protection.

8

4.      In *Chauffeurs, Sales Drivers, Warehousemen Helpers Union Local 572 v. Weslock Corp.,* the 9th Circuit considered whether a secured creditor exercised sufficient control over the operation to become a WARN act employer, so it too does not address when an employer transforms into a fiduciary that may be able to take advantage of the liquidating fiduciary exception. 66 F.3d 241, 244 (9th Cir. 1995).

> B.      *Even If Liquidating Fiduciary Exception Could Apply, Discovery Is Needed To Evaluate Whether The Debtors Continued Any Of their Operations After they Terminated their Teamster And Machinist Represented Employees.*

5.      The liquidating fiduciary exception does not apply if, at the time of termination, the Debtors were continuing to perform the same business activity though for a different purpose. *In Re Start Man Furniture*, LLC, 647 B.R. 116, 130 (D. Del., 2022) (WARN Act applied to an entity that continued to engage in its normal business of selling furniture, but for the purpose of raising cash as a part of liquidating the business). Were the liquidating fiduciary exception applied as the Debtors argue, then all employers that file for bankruptcy would be immune to WARN liability for even pre-petition terminations.

6.      The relevant Department of Labor commentary offers a description of a liquidating fiduciary as a fiduciary whose "*sole function* in the bankruptcy process is to *liquidate* a failed business for the benefit of creditors." 20 C.F.R. § 639.3(a)(1)(ii), 54 Fed. Reg. 16,042, 16,065 (1989) (emphasis added). This Court should find persuasive the narrow reading of the commentary applied in *In re World Mktg. Chicago*, LLC, wherein the Northern District of Illinois determined that even a Debtors in possession that continues to *operate its business* for the benefit of creditors does not fall within the narrow liquidating fiduciary exception. 564 B.R. 587, 600-2 (Bankr. N.D. Ill. 2017).

7.      Here, the Debtors continued to operate their businesses in the ordinary course both before and after the Petition Date. In their *Motion For Authorization To Pay Prepetition Claims Of Certain Critical Vendors, 503(B)(9) Claimants, Lien Claimants, And Foreign Vendors*, [D.I. 12], the Debtors sought entry of interim and final orders authorizing it to pay certain critical and foreign vendors to ensure such vendors continued "to do business with the Debtors." D.I. 12, at ¶¶ 9, 22. In its *Motion For Limited Relief From The Automatic Stay To Permit Setoff Of Certain Customer Claims*, [D.I. 19], the Debtors sought entry of interim and final orders authorizing it to pay certain customers in relation to prepetition customer deposits, stating that authorization was "necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations." D.I. 19, at ¶23.

8.      In their *Motion for Authorization to Pay Taxes to Governmental Authorities*, D.I. 5, ("*Tax Motion*") the Debtors sought permission to pay taxes to government authorities that resulted from its business operations for so-called straddle periods, including the Petition Date. D.I. 5, at ¶10. The Debtors thereby admitted that some of their business operations continued as of August 6, 2023. In the *Tax Motion*, the Debtors explained how failure to pay taxes could affect its right to do business in certain states, specifically:

> ¶¶24, 28 (If the government authorities take action to related to the Debtors' right to do business in certain states, that may disrupt their orderly, cost-efficient wind down efforts; also admits to limited post-petition operations necessary to clear its network and effectuate an orderly wind-down of its businesses).

> ¶33 (If the Debtors' ability to conduct business across the United States – Canada border is impaired, immediate and irreparable harm to the Debtors' estates would result).

> ¶38 (Government authorities' assertion of claims of personal liability against key employers could distract them from their duties related to the Debtors' *restructuring*). (emphasis added).

9.      One of the reasons that the Debtors sought the Bankruptcy Court's leave to obtain additional financing was so that its customers could obtain their freight that remained in the network. D.I. 16, at ¶13. If the Debtors continued to maintain its warehouse operations, even if it did so to protect customer freight rather than to prepare the freight for shipment, it is engaging in some of its pre-bankruptcy business activities rather than merely liquidating the business, so that the liquidating fiduciary exception does not apply. *In Re Start Man Furniture, LLC*, 647 B.R. at 130.

10.      In this case, if the Bankruptcy Court finds the liquidating fiduciary exception could apply to terminations that occurred before the employer filed for bankruptcy, the Teamsters and the Machinists are entitled to conduct discovery as to what business activities the Debtors were engaged in immediately before, at the time of, and after terminating all unionized employees.

## II.      The Faltering Enterprise Defense To WARN Act Liability Does Not Apply.

A.      *The Implementation Of One Yellow Does Not Constitute Raising Capital;
And Thus Cannot Support The Faltering Enterprise Defense.*

11.      Under 29 U.S.C. §2102(b)(1), the faltering enterprise defense only applies if the employer was actively seeking capital or business. In support of its remarkable claim that the implementation of measures to make a company's expenditure of their existing capital more efficient somehow constitutes actively seeking capital, the Debtors only cite to the Third Circuit's Decision in *In re APA Transp. Corp. Consol. Litig.*, for the proposition that actively seeking financing includes internally generated financing. 541 F.3d 233, 249 (3d Cir. 2008), as amended (Oct. 27, 2008) *citing* 20 C.F.R. §639.9(1)(a). This portion of the regulation had nothing to do with the 3rd Circuit's decision, which was that the District Court erred by granting the employer summary judgment on the faltering enterprise defense; and had nothing to do with financing generated from the company's own employees or operations. *Id.* at 250.

12.     In *In re APA Consol. Transp. Corp.*, the 3rd Circuit made no attempt to define what constituted internally generated financing. 541 F.3d. The Debtors have not cited to a single case holding that internally generating financing means implementing procedures that allow the Company to expend its existing capital more efficiently, rather than an employer literally raising capital from internal sources (such as by inviting employees to purchase its stock on favorable terms or negotiating with its employees to establish a Voluntary Employees Beneficiary Association).

13.     Two rules of interpretation compel the conclusion that using existing capital more efficiently does not constitute internally generating financing. First, a regulation should be consistent with the language, origin, and purpose of the statute. *U.S. v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982). Because §2102(b)(1) unambiguously states that the faltering enterprise exception only applies to an employer who is actively seeking capital or business, internally generated financing described by the regulation, §639.9(1)(a), refers to the employer actively seeking to raise capital from its own employees. Merely trying to get more bang for the buck for capital already in the employer's possession cannot constitute actively seeking capital.

14.     Second, even if any ambiguity in the statute or regulation remains, the faltering business exception should be construed narrowly. *In re APA Consol. Transp. Corp.*, 541 F. 3d at 247. Such a narrow interpretation would further suggest that a company's attempt to improve how efficiently it spends its existing capital does not constitute actively seeking capital. Presumably all employers are attempting to cut costs, increase efficiency, and sustain liquidity, without immediately qualifying for the faltering enterprise exception.

B. *The Debtors Were Not Actively Seeking Capital At The Critical Time 60 Days Before They Terminated Their Teamster and Machinist Represented Employees.*

15.    The critical time for analyzing whether the employer was actively seeking capital is 60 days prior to the termination of the employees. *In re AE Liquidation, Inc.,* 522 B.R. at 67 (Where the layoffs occurred on February 24, 2009, the key question is whether the employer was actively seeking capital 60 days before on December 26, 2008). The faltering enterprise defense is not established if an employer actively sought capital during, but not at the very beginning of the 60 days period before it terminated its employees. *In re Jevic Holding Corp.*, 496 B.R. 151, 160 (Bankr. D. Del., 2013); *See also In re APA Transport Corp. Consol. Litigation*, 541 F. 3d 233, 247 (3d Cir. 2008) (faltering enterprise defense should be construed narrowly, and only if the employer was taking the specific steps required at the time the 60 days' notice was required).

16.    Because the Debtors terminated their Teamster and Machinist represented employees on or before July 30, 2023, *Hawkins Decl.*, at ¶108, the question is whether the Debtors were actively seeking capital 60 days previous—on May 31, 2023. The Debtors cannot rely on new efforts to obtain capital that began after May 31, 2023, to establish the faltering enterprise defense.

17.    According to the Debtors, on May 26, 2023, they proposed to their secured lenders to free up collateral so that they could use the freed-up collateral to allow for increased loans and additional borrowing. D.I. 2580 ("*Kaldenberg Decl.*"), at ¶12. The Debtors did not claim that had their existing creditors granted their request to free up collateral, they would have access to any additional capital from those same creditors. Nor did the Debtors reach out to new lenders to obtain additional capital until June 5, 2023. *Hawkins Decl.*, at ¶67. In other words, on or before May 31,

2023, the Debtors were taking the step before actively seeking capital by trying to free up collateral, rather than actually actively seeking capital.

18.     Critically, on May 30, 2023, Senior Vice President of Trucker Relations & Safety, Bryan Reifsnyder, sent a letter to TNFINC asking the Teamsters for an agreement that "[would] enable [Yellow] to implement One Yellow and thereby enable it to secure the financing necessary to sustain operations." *Murphy Decl.*, at ¶42. Mr. Reifsnyder's letter obviates any conclusion that the Debtors were actively seeking capital on or before May 30, 2023. Again, the Debtors were taking a step before actively seeking capital by attempting to "stabilize the Company." *Id.*

19.     Courts narrowly construe the faltering enterprise exception; so that the exception only applies if the employer was actively seeking financing or refinancing; and had a realistic opportunity to obtain the financing sought. *In re APA Transport*, 541 F. 3d at 249; *In re AE Liquidation, Inc.*, 522 B.R. at 67, *citing* 20 C.F.R. 639.9(a)(1) through (4). Similarly, when a company is waiting for the lender to extend financing but did not in writing seek an extension of the loan period, it is not actively seeking capital for the purpose of the exception. *In re APA Transport*, 541 F. 3d at 250. The Debtors have failed to cite a single case holding that undertaking steps to prepare to actively seek capital, such as freeing up collateral, constitutes actively seeking capital. Since the Debtors were not actively seeking capital as of May 31, 2023, 60 days before they terminated their employees, they cannot rely on the faltering enterprise defense to avoid liability under the WARN Act.

20.     For the faltering enterprise exception to apply, the employer must also show that it had a realistic opportunity to obtain the financing or business sought, 20 C.F.R. §639.9(a)(2), and that the failure to obtain capital caused the employment losses suffered by employees. *See e.g. Carpenters Dist. Council v. Dillard Dept. Stores*, 15 F.3d 1275, 1281 (5th Cir. 1994).

21.    Mr. Reifsnyder's May 30, 2023, letter seriously calls into doubt the Debtors' realistic opportunity to obtain financing. As of the date of the letter, Mr. Reifsnyder admits "it has become clear that [Yellow's] current condition, without even considering the inclusion of additional wage increases in the [Letter Of Agreement] beyond the wage and benefit increases already scheduled in the coming months, will preclude refinancing at this time." *Murphy Decl.*, at ¶42. Furthermore, Mr. Reifsnyder states that at most Yellow was seeking "interim relief" from its lenders to provide a "bridge" to the Company. *Id.*

22.    Even if speaking to one's existing lenders to free up collateral constitutes obtaining financing, the Debtors have made no showing that they had a realistic opportunity to persuade their existing lenders to free up the collateral that they sought. *Third Objection*, at ¶86. The Debtors' argument instead focuses on their realistic opportunity to obtain financing that they began to seek on June 5, 2023, which as explained in paragraph 20, is too late to be relevant to the faltering enterprise defense. *Third Objection*, at ¶86.

23.    Finally, even if the Debtors could prove they were seeking capital during the relevant period, they have not provided any evidence lenders or investors would not have provided capital if the Debtors issued a timely WARN notice. *See Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1009 (9th Cir. 2004).

24.    The employer has the burden of establishing that affirmative defenses apply to excuse their obligation to give 60 days' notice to their employees. *In re AE Liquidation, Inc.*, 556 B.R. 609, 617 (D. Del. 2016). The Debtors have failed to meet their burden of establishing they had a realistic opportunity to free up collateral, even if freeing up collateral can constitute actively seeking financing, rather than merely laying the groundwork so that an employer could then later seek financing.

III.   **The Debtors Cannot Rely On The Unforeseen Business Circumstances Exception Because They Failed To Provide An Adequate Notice Of Closing As Soon As Was Practicable.**

A.   _The Notice That The Debtors Provided To The Teamsters And To The Machinists Was Inadequate._

25.   Under 29 U.S.C. §2102(3), even when the faltering enterprise or unforeseen business circumstances defenses are otherwise applicable, the employer must still give its employees as much notice of their layoff as possible; and the notice must contain a brief statement of the basis for reducing the notification period.

26.   When an employer fails to provide to their employees an adequate explanation of the basis for reducing the notification period, the employer is not permitted to assert the affirmative defenses recognized by §2102(b), including both the faltering enterprise defense and the unforeseen business circumstances defense. _In re Tweeter Opco, LLC_, 453 B.R. 534, 547 (Bankr. D. Del. 2011). (The faltering enterprise defense is not available when the employer failed to adequately explain the basis for reducing the notification period); _Graphic Comm. Int'l Union, Local 1B v. Bureau of Engraving, Inc._, 2003 WL 21639146 * 5-6 (D. Minn. 2003) (Though the employer established unforeseen business circumstances, the union is entitled to summary judgment establishing the employer's WARN Act liability, because the employer's notice was both inadequate and untimely). Similarly, because the Debtors did not provide to the Teamsters or the Machinists a notice that complied with §2102(3), the unforeseen business circumstances affirmative defense to WARN Act liability is not available to the Debtors.

27.   Interpreting what constitutes a brief statement of the basis for reducing the notification period, courts have held that merely citing the statutory basis for the exception to employees is insufficient; and that instead the company must provide employees with information that would assist them in determining whether the notice period was appropriately shortened.

16

*Alarcon v. Keller Industries, Inc.*, 27 F. 3d 386, 389 (9th Cir. 1994). The employer must provide its employees with an adequate, specific explanation for why it needed to shorten the notice, including the underlying factual events which led to the shortened period, thereby allowing workers to understand the employer's situation and its reasons for shortening the notice period. *Alarcon*, 27 F. 3d at 389-390.

28.     Merely providing generalities to the employee, such as that "due to adverse business conditions outside our control, we are not able to give you advance notice"; and that "As a result of our bankruptcy filing and the elimination of some services to our customers, today we are conducting a significant reduction in our workforce and your position is directly affected by this reduction," are insufficient. *In re Tweeter Opco, LLC*, 453 B.R. at 547.

29.     Equally importantly, the explanation for why the employer needed to shorten the notice must be a true one. An employer may face liability if the adequate explanation for why it needed to shorten the notice was not true, while its other explanation for why it needed to shorten the notice was not adequately explained. *Alarcon*, 27 F. 3d at 391.

30.     The Debtors now point to the Teamsters' Default Notice as the cause of their closure because the notice caused uncertainty among customers. *Third Objection*, at ¶¶93-98, 46. The WARN Notice that the Debtors issued to the Teamsters and the Machinists, *Hawkins Decl.*, at ¶ 108; *Murphy Decl.*, at ¶56, does not even contain the word "strike" to explain why a longer notice of termination could not be given. The Debtors' brief explanation for why they could not provide a longer, statutorily compliant notice of termination instead stated cryptically:

> The Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated.

*Murphy Decl.*, at ¶56. If the Debtors' unforeseeable circumstances argument is to be believed, their notice to unionized employees was deficient on its face per §2102(3).

31.     The Debtors also claim their prospective lender, Atlas, was still interested in investing in the Debtors after the Teamsters Default Notice; but before the alleged permanent loss of customers became apparent. *Third Objection*, at ¶99. By failing to provide to their employees any statement that explained the Debtors' alleged failed attempts to gain financing from Atlas, the Debtors failed to provide their employees with any statement of the actual basis for reducing the notification period, failing to comply with §2102(3).

32.     Nor can the Debtors rely on other communications sent to their employees on June 8, June 21, and July 20 to avoid liability for two reasons: First, a WARN Act notice must be issued to the representative of the employees; and to the employees themselves only if there is no such representative. 29 U.S.C. §2102(a)(1). The Debtors have made no showing that any of their cited communications were issued to the exclusive bargaining representatives of their employees, i.e., the Teamsters and the Machinists. Second, the June 8 and June 21 letters were issued before the Debtors defaulted on employee compensation payments and before the Debtors received the Default Notice from Teamster local unions; therefore, the Debtors' June letters could not contemplate the Teamsters' Default Notice as the reason for the shortened notice.

B.     <u>The Notice That The Debtors Provided To The Teamsters And Machinists Was Untimely.</u>

33.     An Employer must give to its employees notice of the layoff or termination once the prospects of such a layoff or termination became more likely than not. *In re AE Liquidation, Inc.*, 866 F. 3d 515, 530 (3d. Cir. 2017). Under §2102(3), even when the unforeseen business circumstances defense is available, the employer must still give as much notice as is practicable. *Carroll v. World Marketing Holdings, LLC*, 418 F. Supp. 3d 299, 312 (E.D. WI. 2019) (Even if

18

the employer could not be expected to give notice a full 60 days in advance, it must still give as much notice as possible). The same conclusion is supported by the controlling precedent of *In Re AE Liquidation* in which the 3rd Circuit, after finding the Debtors could not be expected to give notice a full 60 days in advance, then considered whether the Debtors should have given a WARN Act notice on later dates. 866 F. 3d at 531-532.

34.     Courts have held that if the employer fails to provide its employees with the notice required by the WARN Act within 8 days of the date it realizes business closure is likely, the unforeseen business circumstances affirmative defense is not available to the employer. *E.g. Graphic Comm. Int'l Union, Local 1B*, 2003 WL 21639146 * 6 (D. Minn. 2003) (Employees entitled to summary judgment foreclosing employer's use of the unforeseeable business circumstance defense where it failed to give notice until two months after business closure became probable); *Boilermakers Local 1239 v. Allsteel, Inc.*, 1995 WL 348028 * 4-5 (C.D. IL. 1995) (Where employer was aware of the proposed closing of the business by no later than February 14th yet did not give the union notice of the proposed closure until February 24th, the notice was not given as soon as practicable, so that the employer violated the WARN Act).

35.     Judged by this standard, the Debtors' argument that they could not be expected to realize the need to terminate their employees until July 26, 2023, *Third Objection*, at ¶ 99, is absurd. The Debtors sent a letter to TNFINC stating they required financing to sustain operations on May 30, 2023, *Murphy Decl.*, at ¶42, TNFINC sent a letter to the Debtors rejecting the Debtors' proposal (which the Debtors had claimed was necessary to obtain bridge financing) on June 5, 2023, *Murphy Decl.*, at ¶43, the Debtors sought deferral from paying their contractually required health and welfare payments and was denied that request by all the Funds on June 14-15, 2023, *Hawkins Decl.*, at ¶72; *Murphy Decl.*, at ¶¶44, 48, the Debtors' Board of Directors voted to cease

making required contributions to six health and welfare and pension funds on July 7, 2023, *Hawkins Decl.*, at ¶80, the Debtors' cash position had deteriorated to $92 million on July 12, 2023, *Id.*, at  ¶86, the Debtors failed to make their contractually required contributions to Central States on July 15, 2023, *Murphy Decl.*, at ¶¶46-48, the Debtors received the Default Notice from Teamster local unions regarding its failure to pay Central States on July 17, 2023, *Hawkins Decl.*, at ¶88; *Murphy Decl.*, at ¶¶49-50, the Debtors' Board understood that that shipments would decline rapidly on July 18, 2023, *Hawkins Decl.*, at ¶93, the Debtors received a notice of establishment of availability reserve of $25 million due two days subsequent on July 19, 2023, *Third Objection*, at ¶ 94, and the Debtors stopped taking new orders on July 24, 2023, *Third Objection*, at ¶46. Beginning as early as May 30, 2023, and possibly earlier, the Debtors should have known that termination of their employees was a probability. At the very latest, the Debtors cemented the inevitability of mass terminations and plant closings when they stopped taking new orders on July 24, 2023, thereby ensuring little to no cash would be coming in and there would be a reduced need for unionized employees responsible for warehousing, loading, and delivering orders.

36.     When examined within the context of the Debtors' several decades of financial struggle, rampant structural inefficiencies, and impending liquidity crisis, *Hawkins Decl.*, at ¶¶18, 19, 36, 39, 42, 57, 59, 62, 65, 67, 72, 75, 80; *Murphy Decl.*, at ¶¶10, 12, 35-48, the events of 2023 illustrate an inevitable march towards bankruptcy. *See Chaney v. Vermont Bread Co.*, No. 2:21-CV-120, 2023 WL 5589113, at *11 (D. Vt. Aug. 24, 2023) (Unforeseeable circumstance defense not available where allegedly unforeseeable event occurred entirely within the company).

37.     The Teamster's Default Notice stated that the Teamster local unions intended to strike unless and until the delinquencies to the Central States were cured. *Hawkins Decl.*, at ¶88. The Debtors have not provided the Bankruptcy Court with a reasonable explanation why, absent

curing their default, they believed Teamster local unions would not issue a Default Notice. The Teamster affiliated employees were basically asked by the Debtors to continue to work without full compensation and with the fear that any health claims they incurred would not be paid. *Murphy Decl.*, at ¶48. Those workers, through their representatives, issued a Default Notice in response, communicating that they would not continue to work for reduced pay. *Murphy Decl.*, at ¶¶49-50. Even if Teamster local unions had not issued the Default Notice, the Debtors could not have expected all Teamster affiliated employees to continue working without any healthcare coverage. *Murphy Decl.* ¶¶28, 48. Employees could have and reasonably would have quit had they been asked to work the same job with reduced pay. Just as no reasonable person would expect a bank to grant loan forbearance to a defaulted Debtors indefinitely, no reasonable person should expect employees to grant an indefinite forbearance of their compensation. *See Chaney*, WL 5589113, at *11 (Continued forbearance of loan in default is not guaranteed, and a lender calling a loan in default is not an unforeseen circumstance).

38.    The Debtors also cannot argue that they believed they could avoid the terminations simply because the Teamsters returned to the bargaining table on July 23, 2023. While the negotiations between the Debtors and the Teamsters did yield an agreement with Central States to extend benefits to the Debtors employees for 30 days, thereby averting any work stoppage, *Murphy Decl.*, at ¶52, according to the Debtors sufficient damage had been done to its customer base by the Teamsters' Default Notice, that they stopped taking new customer orders the very next day, on July 24, 2023. *Hawkins Decl.*, at ¶46. In fact, the Debtors likely chose to cease taking new orders before receiving the Teamsters' final bottom-line term sheet late Monday night on July 24, 2023. *Murphy Decl.* ¶ 55; *Hawkins Decl.*, at ¶100.

39.     The Debtors cannot claim that it believed its petition for a preliminary injunction could have avoided all terminations. The Norris-LaGuardia Act and the case law interpreting it make clear that Federal courts cannot enjoin labor unions lawfully participating in a labor dispute. U.S.C. §§ 101, et seq; *See United Mine Workers v. Gibbs*, 383 U.S. 715, 737 (1966). A union's right to strike where contractually explicit is well-established. *See e.g. Chicago District Council of Carpenters Pension Fund v. K&I Construction, In.,* 770 F.3d 1060 (7th Cir. 2001) (Court could not enjoin union from striking where employer failed to pay pension funds and relevant contract specifically allowed for strikes in such instances.); *Allied Sys. Ltd. v. Teamsters Nat. Auto. Transporters Indus. Negotiating Comm., Loc. Union 327*, 179 F.3d 982 (6th Cir. 1999) (Court could not enjoin union from striking over employer alleged failure to pay established wage rate where relevant contract excepted such a dispute from the mandatory arbitration procedures.); *Matter of Crowe & Assocs., Inc.*, 713 F.2d 211 (6th Cir. 1983) (Bankruptcy court could not enjoin union from striking where relevant contract specifically provided that the union could strike if employer failed to remit payments to pension funds).

40.     At a minimum, additional discovery is appropriate concerning the Debtors' purported reasons for terminating its unionized employees. *See In Re Start Man Furniture*, 647 B.R. at 137.

**IV.     The Debtors' Good Faith Defense Fails.**

41.     To establish the good faith defense, the employer must meet its burden of demonstrating it had both a subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act. *In re Jamesway Corp.*, 235 B.R. at 345. The good faith reduction is intended for circumstances when the employer technically violated the law but shows that it did everything possible to ensure that its employees received

sufficient notice that they would be laid off. *Castro v. Chicago Housing Authority*, 360 F. 3d 721, 731 (7th Cir. 2004).

42.     Moreover, an employer can be charged with knowledge of statutes, regulations and case law. The legal authority concerning WARN notices are clear that employers must provide, as soon as was practicable, notice to employees of an impending mass layoff. If that notice is less than 60 days, employers must provide a brief statement explaining why reduced notice was necessary. *In re Jamesway Corp.*, 235 B.R. at 347. On all terms, the Debtors failed to fulfil their statutory duty.

43.     Regardless of whether the Debtors could otherwise establish the unforeseen business circumstances defense, they cannot rely on the defense here, and failed to comply with the WARN Act, because the notice of layoff that it ultimately issued was both deficient in content and untimely. The Debtors had no objectively reasonable basis for believing their notice could comply with §2102(b)(3), given that their notice failed to explain what they believed to be the real reason for shortening the notice period. Nor did the Debtors have an objectively reasonable basis to wait until July 30th to give notice to their employees, given that they stopped taking orders on July 24, 2023, and knew as early as May 30th that refinancing was not available due to their financial condition.

**V.     State WARN Act Claims Must Be Allowed.**

44.     Just as Federal WARN Act claims filed by the Teamsters and Machinists on behalf of their members should be allowed in their entirety for the above stated reasons, so too should State WARN Act[4] claims be allowed, particularly where the applicable State WARN Acts do not

---

[4] State Warn Acts include California (Cal. Labor Code §§ 1401-1406) Delaware (Del. Code tit.19, § 1901 - 1911), Illinois (820 Ill. Comp. Stat. Ann. 65/5 - 5/99), Iowa (Iowa Code §§ 84C.1 – 84C.5), Maine (Me. Rev. Stat. tit. 26, §§ 625-B- 626-A), New Hampshire (N.H. Rev. Stat. § 275-F:1 – 275-F:12), New Jersey (NJ Rev Stat §§ 34:21-1 –

even include the defenses that have been asserted by Debtors and/or are more restrictive than the Federal WARN Act.

45.     For example, The Millville Dallas Airmotive Plant Job Loss Notification Act ("New Jersey WARN Act"), N.J.S.A. 34:21-1 to -7, does not contain exceptions or defenses through which an employer that violates the New Jersey WARN Act can avoid liability. *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013). The Debtors failed to provide the ninety (90) days' notice required by the New Jersey WARN Act to their New Jersey employees, *Third Objection*, at ¶50, and therefore the Teamsters' and Machinists' New Jersey WARN Act claims should be allowed in their entirety with any Federal WARN Act violation recovery being credited towards the violation recovery requirements of the New Jersey WARN Act. Further, the California Labor Code § 1400 et. seq. ("California WARN Act") contains no unforeseeable business circumstances defense and has very specific requirements for any employer seeking to rely on the "faltering company" exception under the California WARN Act (in addition to what the Federal WARN Act requires), and which the Debtors did not meet. Accordingly, those defenses are unavailable to Debtors under the California WARN Act with regard to their California employees.

46.     Just as Federal WARN Act claims filed by the Teamsters and Machinists on behalf of their members should be allowed in their entirety for the above stated reasons, so too should State WARN Act claims which are no more restrictive than the Federal WARN Act and may provide for additional recovery to claimants.

---

34:21-6) New York (N.Y. Lab. Law §§ 860 – 860-i), Vermont (21 V.S.A. §§ 411 - 418, Wisconsin (Wis. Stat. § 109.07).

**CONCLUSION**

47.    For the reasons given and for reasons to be presented as these proceedings continue to trial, the Teamster and Machinist WARN claims should be allowed in their entirety, except as is necessary to avoid duplicative recovery.

48.    The Teamsters and Machinists ask that the Bankruptcy Court continue the April 11, 2024, hearing on *Debtors' Third Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, the *Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, and the *Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, D.I Nos. 2576-2578, to allow the parties to meet and confer regarding a consensual scheduling order.

(Signatures to Follow)

Dated: March 28, 2024

LAW OFFICE OF SUSAN E. KAUFMAN, LLC

*/s/ Susan E. Kaufman*
Susan E. Kaufman, (DSB#3381)
919 North Market Street, Suite 460
Wilmington, DE 19801
T: (302)-472-7420
F: (302)-792-7420
skaufman@skaufmanlaw.com

-and-

Emma Woods (WI State Bar No. 1120187)
Frederick Perillo (WI State Bar No. 1002870)
THE PREVIANT LAW FIRM, S.C.
310 W Wisconsin Ave, Suite 100MW
Milwaukee, Wisconsin 53203
Telephone: 414.271.4500
Facsimile: 414.271.6308
emw@previant.com
fp@previant.com

*Counsel for The International Brotherhood of
Teamsters, Teamsters National Freight Industry
Negotiating Committee, its affiliated local unions,
and their respective bargaining members, and The
International Association of Machinists and
Aerospace Workers, and its affiliated district
lodges, and their respective bargaining members*