UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re

YELLOW CORPORATION, *et al¹*.

        Chapter 11
        Case No. 23-11069 (CTG)
        (Jointly Administered

        Debtors.

------------------------------------------------------------------

## WARN REPRESENTATIVES' RESPONSE IN OPPOSITION TO DEBTORS' THIRD, FOURTH AND FIFTH OMNIBUS (SUBSTANTIVE) OBJECTIONS TO PROOFS OF CLAIM FOR WARN LIABILITY (DOCS. 2576, 2577 AND 2578)

This is a response by Vidal Torres, Miguel Martinez, Alexis Green and Gregory Hall ("Plaintiffs"), on behalf of themselves and the proposed Class they seek to represent, to Debtors Third, Fourth and Fifth Omnibus (Substantive) Objections To Proofs of Claim For WARN Liability (Docs. 2576, 2577 and 2578) (collectively, the "Objection"). Plaintiffs also adopt the arguments of the International Brotherhood of Teamsters and International Association of Machinists in Doc. 2778.[2]

Vidal Torres, Miguel Martinez, Alexis Green and Gregory Hall, former non-bargaining unit employees of the Debtors, have pending in this bankruptcy case a class action adversary proceeding

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 511500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] On or about November 10, 2023, the International Brotherhood of Teamsters ("Teamsters") and the International Association of Machinists ("IAM" and collectively with Teamsters, the "Unions") filed proofs of claim, on their own behalf and on behalf of their bargaining unit members, against the Debtors which include claims under the WARN Act. The Unions have the authority to represent their bargaining unit employees on WARN Act claims, *See, e.g.*, 29 U.S.C. § 2101 (a)(4). The other Plaintiffs in the WARN Action—namely, Jeff Moore, Elizabeth Brooke Moore, Armando Rivera, John Franklin, Jr., Nicole Gonzalez, Richard Webb, Scott Webb, Daryl Devine, Richie Richardson, Paul Ashley, Brandon Wilson, Dustin Page, Kimberly Sullivan, Antonio Reyes, Spencer Shook, Joseph Duguay, Sheila Wood, Sheldon Kinney, Dustin Kell, Christopher Dowdy, Rhonda Dvorak and Rodney Damm, Jr.-- are Teamsters' bargaining unit employees whose WARN claims are now being prosecuted by the Teamsters. The Teamsters and IAM, in their response [Doc. 2778] advocate on behalf of all bargaining unit members impacted by

against the Debtors (also referred to herein as "<u>Defendants</u>"), Adversary Pro. No. 23-50457 (CTG) (the "<u>WARN Action</u>") in which they assert Debtors violated the Worker Adjustment and Retraining Notification Act of 1988 29 U.S.C. §§ 2101-2109 *et. seq.* (the "WARN Act"); the California Labor Code § 1400 et. seq. ("California WARN Act") for the California Employees and for the New Jersey Employees, the New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act, PL. 2007, c.212, C.34:21-2 ("New Jersey WARN Act" and collectively with the WARN Act and California WARN Act, the "WARN Acts") by ordering –(a) mass layoffs and/or plant closings as defined by the WARN Act; and/or (b) (with respect to the California Employees) mass layoffs, relocations, or terminations as defined under the California WARN Act; and/or (c) (with respect to the New Jersey Employees) mass layoffs and/or termination of operations as defined by the New Jersey WARN Act- - on or about July 28, 2023, within thirty days of that date or thereafter, and failing to give the Plaintiffs and the Other Similarly Situated Employees of the Defendants at least 60 days' advance written notice of termination, as required by the WARN Act and California WARN Act or 90 days' notice as required by the New Jersey WARN Act for the New Jersey Employees.

Nearly a month prior to Debtors' filing of the Objection, Plaintiffs and Debtors fully briefed Plaintiffs' pending amended motion for class certification in the WARN Action (the "<u>Class Motion</u>"). In the Class Motion, Plaintiffs seek the certification of a class comprised of all former non-bargaining unit employees of one or more of the Defendants, who worked at, reported to, or received assignments from any Defendant's facilities across the United States ("Facilities") and were terminated without cause on their part, on or about July 28, 2023, within thirty days of that date or thereafter as part of, or as the reasonably expected consequence of –(a) mass layoffs and/or plant closings as defined by the WARN Act; and/or (b) (with respect to the California Employees) mass

the Objection. The Objection should be overruled as to all employees, for reasons stated by the Teamsters and IAM

layoffs, relocations, or terminations as defined under the California WARN Act; and/or (c) (with respect to the New Jersey Employees) mass layoffs and/or termination of operations as defined by the New Jersey WARN Act – ordered by one or more Defendants and who do not file a timely request to opt-out of the class (the "Class"). On February 22, 2024, Debtors filed a notice of request for oral argument on the Class Motion. The Court offered March 20, 2024 as a hearing date on the Class Motion, to which Debtors responded they had a conflict on that date. Debtors offered hearing dates in April, instead. After the Class Motion was set for hearing on April 11, 2024, and rather than waiting for a decision on the fully briefed pending Class Motion, Debtors opted instead to attempt an end run around the WARN Action with the Objection.

In its Objection[3], Debtors ask for the disallowance of all WARN claims, including, without limitation, the Class Proofs of Claim that Torres filed against Debtors for WARN violations, on his own behalf and on behalf of the Class, as well as WARN claims made by ex-non-bargaining unit employees who may be members of the putative class in the WARN Action, if certified in a matter of days or weeks.

Plaintiffs ask that this Court make no ruling on the Objection that would deprive any putative class member of the right to obtain any relief to which they may be entitled through the WARN Action. In the interest of justice, if this Court certifies the Adversary Proceeding as a class action, all members of the Class should be permitted to recover if the Class prevails. Debtors' Objection should not stand in the way of the right of any Class member to recover in the WARN Action, should this Court certify a class. In its Objection, Debtors seek to escape WARN Act liability on the

---

and for reasons stated herein, as well.
3 Debtors state in the Objection that Debtors may file four substantive omnibus claims objections per month, each containing up to 500 claims. Debtors state that, to date, they have identified over 1,300 proofs of claim asserting WARN liability. The Debtors filed the cookie cutter Third, Fourth, and Fifth Omnibus Objections

basis of five arguments; but none of these arguments warrant blocking any former employee from WARN Act recovery at this time, especially given the pendency of the WARN Action and the Class Motion pending therein.

In the Objection, Debtors argue that the proofs of claim asserting WARN liability (under both federal and state law) should be disallowed, because, they claim: Yellow Corporation ("Yellow") was a "liquidating fiduciary" rather than an "employer" as of July 26, 2023, and not subject to the WARN Acts' requirements; Yellow was subject to the "faltering company exception" because it was actively pursuing the One Yellow initiative and also, hired Ducera Partners to actively negotiate on its behalf with existing lenders, new lenders and private equity fund Atlas Holdings to obtain new cash; Yellow did not foresee that "the Union would choose to exterminate Yellow rather than negotiate Phase 2 of One Yellow"; "Yellow objectively and in good faith believed it had no obligation to issue WARN notices any earlier than it did" and "additional reasons," including the releases signed by 32 individual non-bargaining unit claimants and lack of information provided by 18 claimants to show "that they worked at Yellow when the layoffs occurred at the end of July." All of these issues, as relating to the proposed Class, can and should be resolved through the adversary proceeding—and none support dismissal of any of the proofs of claim for WARN liability.

## 1.    <u>YELLOW WAS NOT A LIQUIDATING FIDUCIARY</u>

Debtors argue (Objection at 24-28) that the WARN Act is inapplicable here because this case does not involve a violation of the WARN Act by an "employer." Instead, Debtors say that Yellow was a so-called "liquidating fiduciary" that is exempt from the Act. This argument is contrary to the

---

contemporaneously on March 12, 2024, each objecting to proofs of claim asserting WARN liability on nearly identical grounds.

statutes (both state and federal), is unsupported by the caselaw which the Debtors cite, and would (if accepted) make a mockery of the federal and state WARN Acts.

Debtors terminated more than 25,000 employees abruptly, without the advance written notice required by the WARN Acts. According to Debtors' first day filings, Debtors had facilities across the country, with employees in all fifty states. The majority of the Debtors' 25,500 or so employees were unionized. On July 30, 2023, Debtors halted their operations, having terminated approximately 3,500 non-bargaining unit employees on July 28, 2023 and approximately 22,000 union employees on or about July 30, 2023. Debtors claim in their Objection "[t]he Company had no time to plan, much less provide WARN notice for, what became mass layoffs on July 28 and July 30, 2023." Objection at 5. On August 6, 2023 (the "Petition Date"), Debtors filed with this Court voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, which are now jointly administered under case number 23-11069 (CTG) (the "Bankruptcy Case").

This case does not present the question whether and when a mass termination ordered during bankruptcy by a debtor or trustee, or a mass termination otherwise carried out under the auspices of a bankruptcy court, is covered by the WARN Act. This case instead involves a mass termination ordered by the employer's own management, before any bankruptcy petition was filed and during a time when even the Debtors have previously admitted they were operating. In trying to stretch the "liquidating fiduciary" cases to cover this very different set of facts, the Debtors have gone too far.

The federal WARN Act defines "employer" as "any business enterprise that employs - (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1). And the Debtors quite obviously were a "business enterprise" (and there is no dispute that Debtors employed the requisite number of people). But the Debtors are trying to suggest that an

entity is no longer a "business enterprise" if it is in the process of shutting down. That is to say, the Debtors suggest that what Congress meant in the WARN Act is that you must give employees advance notice of mass terminations, *unless* those mass terminations are ordered as part of a shut-down process. But if Congress had meant that, Congress would have said it. Such an intent would be quite striking in the context of the Act as a whole – making a huge exception to a law whose whole point is to require notice of mass terminations, including those caused by a "*plant closing*". If Congress had meant to say "unless you're in the process of going out of business," Congress surely would have said so. The simple phrase of "business enterprise" would be a truly odd and obscure way of conveying such a hypothesized intent. Debtors, including Yellow, were a business enterprise, under any reasonable understanding of that phrase. Likewise, Debtors were also an "employer" for purposes of the California and New Jersey WARN Acts.

The Department of Labor (DOL) commentary on WARN regulations provides the following with regard to bankruptcy:

> DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.

54 Fed. Reg. 16042 (1989), quoted in *Teamsters Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995). This Commentary gives rise to a small line of "liquidating fiduciary" caselaw under the WARN Act.

But, by its terms, that DOL Commentary does not speak to this case. It speaks to whether a bankruptcy trustee (or perhaps a debtor-in-possession) "succeed[s] to the notice obligations of the

former employer," *id.* Thus, it is about whether the fiduciary <u>in bankruptcy</u> <u>must give notice before</u> <u>ordering a plant closing or mass layoff in bankruptcy</u>. It is not about whether the estate is liable for pre-bankruptcy violations of the WARN Act. And even as to whether the fiduciary entity in bankruptcy itself has WARN Act notice obligations, the question (under the DOL commentary) depends on whether that entity's "sole function in the bankruptcy process is to liquidate," *id.* An entity which has had a larger function may, under the DOL Commentary, have the WARN notice obligation.

So, neither the statutes nor the DOL Commentary purport to take a claim like this one out of the coverage of the WARN Act. As shown below, the Debtors are also wrong about the caselaw; the caselaw does not support their argument either.

Debtors cite no case in which the "liquidating fiduciary" concept has been used (as Debtors would use it here) to bar liability of the employer itself, for a decision made by the longtime employer itself, regarding pre-petition terminations. The Debtors cites four cases and none of them are like this case in that sense.

In *In re United Healthcare System, Inc.*, 200 F.3d 170 (3d Cir. 1999), the terminations took place post-petition. There had been a WARN notice contemporaneous with the bankruptcy filing, but that notice had said that terminations would come in 60 days. *Id.* at 173 & n.2. That would not have been a WARN violation. The act that could have engendered WARN Act liability, instead, was the <u>subsequent, post-petition</u> acceleration of those terminations. *Id.* at 173; *id.* at 175 ("We address only the threshold question on appeal: whether … United Healthcare continued as an 'employer' within the meaning of the WARN Act after filing for Chapter 11 bankruptcy, and was therefore subject to the WARN Act notification requirements when it furloughed its 1,200 employees on March 6, 1997.")

The *United Healthcare* Court looked to the same DOL Commentary quoted above, *see id.* at 177, and asked whether the employer "as debtor-in-possession" was covered by the Act, *id.* The Court held that it would depend on whether, when ordering the terminations in bankruptcy, the employer was liquidating or continuing to operate.

> As discussed in the Department of Labor commentary, merely filing for bankruptcy does not exempt an entity from the WARN Act. Instead, the commentary's focus on the bankruptcy fiduciary's responsibilities indicates that whether a bankrupt entity is an "employer" under the WARN Act depends in part on the nature and extent of the entity's business conduct and activities while in bankruptcy.

*Id.*

> In light of the Department of Labor commentary to the regulations and the cases cited, we believe that whether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy, and not merely on whether the entity's employees continue to work "on a daily basis."

*Id.* at 178 (emphasis supplied).

The Court held that the employer in that case, "as the fiduciary in bankruptcy proceedings," was liquidating rather than operating as a going concern, *id.*; accordingly, it had no WARN Act notice obligation when it terminated its employees. "In conclusion, we do not believe United Healthcare continued as an 'employer' within the meaning of the WARN Act when it assumed the role of fiduciary following the filing for bankruptcy." *Id.* at 179 (emphasis supplied). Notably, the Court "express[ed] no opinion on whether United incurred WARN liabilities at some point prior to the filing of its petition …," *id.* at 179, n. 10.

Being based squarely on the DOL Commentary and the post-petition nature of the terminations, the Court's holding in *United Healthcare* gives no help to an employer (as in this case) whose own management violates the WARN Act pre-petition.

Debtors also cite *In re MF Glob. Holdings Ltd.*, 481 B.R. 268, 280 (Bankr. S.D.N.Y. 2012) but it is clearly distinguishable and provides no support for the Debtors' argument.  In *MF Global*, multiple entities were sued for WARN violations resulting from terminations implemented on November 11, 2011. *Id.* at 273. In dismissing WARN claims against MFGI, which was in liquidation pursuant to the Securities Investor Protection Act (SIPA) and under the authority of a SIPA Trustee, the Court found that:

> from the moment the SIPA proceeding was removed to this Court on October 31, 2011, the SIPA Trustee was unquestionably a "liquidating fiduciary." *Id.* at 282-283.  The statute governing the appointment of the SIPA Trustee states that the SIPA Trustee's purpose is "to liquidate the debtor's business." 15 U.S.C. § 78fff(a). The SIPA Trustee immediately began to wind down MFGI's assets and engage in other activities for the purpose of liquidating the estate. Even if the SIPA Trustee had wanted to continue operating the business as a going concern, he was statutorily prohibited from doing so.

*Id.* at 282-283.

Debtors' reliance on *Teamsters Local 572 v. Weslock Corp.*, 66 F.3d 241 (9th Cir. 1995) is also misplaced. *Weslock* does <u>not</u> stand for the proposition that a business enterprise becomes exempt from the WARN Act if it is going out of business and liquidating. It stands at most for the proposition that an entity (which has not been the employees' employer all along) does not become a WARN-covered employer if its <u>sole</u> authority over employment decisions comes as part of a liquidation process.  Even that proposition would not help the Debtors here.

The question in *Weslock* was whether WARN Act liability could be imposed, not on the business enterprise that had run the plant for years (Weslock), but instead on a secured lender (Westinghouse). The question therefore was not whether Weslock was an "employer," but whether Westinghouse (the lender) was. The Court analogized the case to the bankruptcy fiduciary discussed in the DOL Commentary, and applied a similar rule: a lender <u>can</u> be a WARN Act employer, but

will not be deemed such if its sole decision-making function over employment was to liquidate the business. *Id.* at 244.

Importantly, the Court did <u>not</u> then ask just whether the mass termination itself was a liquidation-furthering event. That was not the operative question. Instead, the operative question was whether the entity in question (there, the lender) had operated the business <u>before that</u> as an ongoing concern. Indeed, the Court delved into whether Westinghouse could be said to have operated the business as a going concern <u>for as little as six days</u> prior to the mass termination. Because Westinghouse did not do so, it was not (in the eyes of the Court) a WARN Act "employer." *Id.* at 244-45.

Thus, the question under *Weslock*, like the question under the DOL Commentary, is about the WARN Act liability of an entity that <u>didn't</u> run the business while it was ongoing. None of these authorities purports to remove WARN Act liability from an entity that was the employer all along, through good times and bad, and which then orders a mass termination outside of bankruptcy. Here, Debtors, including Yellow, obviously ran the business as a going concern, for years. Debtors were, simply, an employer.

Lastly, in *Walsh v. Diamond (In re Century City Doctors Hospital, LLC)*, 2010 Bankr. LEXIS 5048 (9th Cir. BAP Oct. 29, 2010), terminations were ordered and carried out after the bankruptcy filing. *Id.*, *2-4; *7. The Ninth Circuit BAP held (as reflected in a section heading in its opinion), "The bankruptcy court did not err when it determined that the Trustee was not an employer under the WARN Act." *Id.*, *17 *et seq.* In reaching that conclusion, the Court relied on the DOL Commentary. *Id.* at *18-19.

*Century City* was about whether the <u>Trustee</u> had "the notice obligations" under the WARN Act, *id.*, where the terminations took place under the auspices of the Trustee "in the bankruptcy

process," *id.* – i.e., post-petition. Because the Trustee's "sole function in the bankruptcy process [was] to liquidate," *id.* at 18-19, the Court viewed the Trustee as being able to terminate without giving WARN Act notice, under the Department of Labor Commentary.[4]

Therefore, *Century City* does not suggest that <u>pre-petition</u> terminations ordered by the employer itself are outside the scope of the WARN Act.  Indeed, the Court explained the importance of the distinction between pre-petition and post-petition terminations, in a way that destroys the Debtors' reliance on *Century City* in this case:

> <u>This issue is significant because someone other than the Trustee necessarily would have been responsible for any termination that occurred prepetition</u>, because the Trustee, as a matter of law, could not have assumed control and management responsibility over CCDH and its assets until CCDH's chapter 7 bankruptcy was commenced. <u>If someone else was responsible for the terminations, that party presumably would *not* have been a liquidating fiduciary. For instance, if CCDH's pre-bankruptcy management was responsible for the terminations, then CCDH could qualify as an employer under the WARN Act</u>, and its bankruptcy estate might have had administrative expense priority liability for any back pay that was due as a result of violation of the WARN Act and that was attributable to the postpetition period. See 11 U.S.C. § 503(b)(1)(A)(ii).

*Id.*, *29, n.9 (emphasis supplied).  This passage makes it clear: prepetition terminations carried out by the employer's management presumably <u>would</u> be covered by the WARN Act, and the "liquidating fiduciary" concept presumably <u>would not</u> apply.  That is this case. *Century City* undercuts any claim by Debtors that Yellow (or any other Debtors, for that matter) was a "liquidating fiduciary" on July 28 or July 30, 2023.  None were exempt from state and federal WARN obligations on this basis.

---

[4] The Court went on to hold, *id.* *22-28, that there were no meaningful allegations that the Trustee had any role other than to liquidate the business; thus there were no facts to take the case out of the norm stated in the first sentence of the DOL Commentary.  The Court also noted, importantly, that these terminations were carried out <u>by the Trustee</u>, who had sole authority once the petition had been filed.  *Id.*, *30-34.

In sum, the Debtors' have cited no case that actually supports their argument that the "liquidating fiduciary" concept has any applicability here. And the Debtors failed to cite the cases that recognize the clear point: pre-petition terminations by the employer's own management are covered by the WARN Act, even if they may be described as being part of a liquidation plan. *See, e.g.*, *In re Jamesway Corp.*, 235 B.R. 329, 343-44 (Bankr. S.D.N.Y. 1999) (pre-petition terminations were covered by WARN Act, even where they were part of a liquidation plan; the "subsequent filing of the bankruptcy petition did not divest it of its obligations under WARN to those employees"); *Law v. American Capital Strategies*, No. 3:05-0836, 2007 U.S. Dist. LEXIS 5936, *43-49 (M.D. Tenn. Jan. 26, 2007)

For these reasons, the so-called "liquidating fiduciary" concept is inapplicable and certainly does not support dismissal of the claims in this case.

## 2. THERE ARE NO EXCEPTIONS AVAILABLE IN THIS MATTER TO THE WARN ACTS' NOTICE REQUIREMENTS

As an initial matter, and as recognized by Debtors, the New Jersey WARN Act provides no exceptions. *See, e.g.*, Objection at 23.

Further, the California WARN Act contains no "unforeseeable business circumstances" defense. And, with regard to any request for an exception under California Labor Code § 1402.5 ("California WARN Faltering Company Exception"), the statute provides as follows:

> (a) An employer is not required to comply with the notice requirement . . .if the department determines that all of the following conditions exist:
> 1) As of the time that notice would have been required, the employer was actively seeking capital or business.
> 2) The capital or business sought, if obtained, would have enabled the employer to avoid or postpone the relocation or termination.
> 3) The employer reasonably and in good faith believed that giving the notice required by subdivision (a) of section 1401would have precluded the employer from obtaining the needed capital or business.

(b) The department may not determine that the employer was actively seeking capital or business under subdivision (a) unless the employer provides the department with both of the following:

(1) A written record consisting of all documents relevant to the determination of whether the employer was actively seeking capital or business, as specified by the department.

(2) An affidavit specifying the contents of the documents contained in the record submitted pursuant to paragraph (1) of subdivision (b) are true and correct. . . (emphasis added)

Debtors bear the burden of proof on any statutory WARN defenses, including the California WARN Faltering Company Exception. *See, e.g., In re APA Transport Corp. Consolidated Litigation*, 541 F.3d 233, 246 (3rd Cir. 2008); 20 C.F.R. § 639.9 ("The employer bears the burden of proof that conditions for the exceptions have been met.")  However, Debtors have provided no evidence or documentation indicating that Yellow complied with the requirements of this provision, much less received any determination by the California Employment Development Department exempting Yellow from the notice requirements of the California WARN Act. *Gunderson v. Alta Devices, Inc.*, No. 19-CV-08017-BLF, 2021 WL 4461569, at *3 (N.D. Cal. Sept. 29, 2021)(plaintiff awarded summary judgment striking the California WARN Act defenses due to defendant's failure to "provid[e] written records to the California Department of Industrial Relations, to justify lesser or no notice.").

Thus, any such defenses asserted by Debtors as to the New Jersey WARN Act with regard to the New Jersey Employees or as to the California WARN Act with regard to the California Employees are unavailable as a matter of law.

The federal WARN Act does allow less than sixty days' advance notice of a plant closing under limited circumstances. *See* 29 U.S.C. § 2102(b)(1) (sometimes termed the "faltering company"

exception)[5]; 29 U.S.C. § 2012(b)(2)(A) (sometimes termed the "unforeseeable business circumstance" exception).[6] Those exceptions are also inapplicable here.

First, Debtors, including Yellow, are precluded from invoking these exceptions because, beyond genuine dispute, they did not do what the statute requires. An employer relying on these exceptions "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3).

Here, it is undisputed that Debtors gave *no* advance notice—not even a contemporaneous notice.  As shown herein, WARN notice must be served, i.e., delivered. 29 U.S.C. § 2102(a); 20 C.F.R. § 639.8.  Here none was, rather employees were told that they could try to gain access to a notice, *but only post-termination.  See*, Declaration of Sarah Statlander in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim For WARN Liability (Doc. 2582, "Statlander Declaration", ¶¶ 7, 10) (non-bargaining-unit employees terminated on July 28; all eligible non-union employees who were laid off on July 28, 2023 were offered a Notice of Separation & Release of Claims that had to be accessed electronically); Exhibit 1, EPIQ General FAQs excerpt (No. 12: "How do I review and sign my Severance Agreement? *Following the termination of your employment*, *you will be able to access relevant documents including your Notice of Separation & General Release of Claims (Severance Agreement)*, benefits information and

---

[5] "An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business."

[6] "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."

IT information via Oracle.")(emphasis added).. Again, WARN Act notices are written notices that must be "serve[d]" in a way "designed to ensure receipt. . .before separation."  *See*, 20 C.F.R. § 639.7(a)(2) (". . .the employer must ensure that all of the information required by this section is provided in writing . . .at least 60 days in advance of a covered employment action."); 20 C.F.R. § 639.8 (requiring "reasonable method of delivery. . .which is designed to ensure receipt of notice of least 60 days before separation"); *see also*, 29 U.S.C. § 2102(a) ("An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves <u>written</u> notice of such an order …"); 20 C.F.R. § 639.7(d) ("Notice to each affected employee who does not have a representative is to be <u>written</u> in language understandable to the employees …").  Debtors did not serve any advance written notice of termination on any employee.

Furthermore, even if Debtors' belated "notice" (that had to be accessed by non-bargaining unit employees electronically through Oracle) is considered to be a WARN notice (which it should not, for the reasons shown herein), Debtors did not do what the statute requires: "give a brief statement of the basis for reducing the notification period" (§ 2102(b)(3)), i.e., explain why notice could not have been given sixty days in advance.

To be clear, an employer seeking to rely on the "UBC" or "faltering company" defense must, <u>as a prerequisite</u>, give affected employees as much notice as is practicable, <u>and</u> the notice must include a brief written statement explaining the reason why less than sixty (60) days' notice was given.  29 U.S.C. § 2102(b)(3).  *See also*, 20 C.F.R. § 639.9 ("[T]he employer must give as much notice as is practicable to… non-represented employees…" and "[t]he employer must, at the time notice is given, provide a brief statement of the reason for reducing the notice period, *in addition to the other elements set out in [20 C.F.R.] § 639.7*." (emphasis added)).  As one Court noted, "Federal courts have interpreted § 2102(b)(3) as imposing a condition precedent to reliance on the [WARN]

defense[s]." *Weekes-Walker v. Macon Cty. Greyhound Park, Inc.*, 877 F. Supp. 2d 1192, 1204 (M.D. Ala. 2012*), aff'd sub nom*, *Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013).

The failure of an employer to comply with either of these prerequisites, precludes the defenses and Courts routinely reject WARN Act affirmative defenses when no written notice was issued or when the written notice does not contain the requisite information. *See, e.g*., *Barnett v. Jamesway Corp. (In re Jamesway Corp.)*, 235 B.R. 329, 340 (Bankr. S.D.N.Y. 1999) (employer's failure to explain why it did not provide affected employees with the full sixty-day notice was "alone . . . grounds for finding that the [c]orrespondence does not provide WARN notice."); *In re CS Mining, LLC*, 2017 WL 11037153, at *4 (Bankr. D. Utah Dec. 20, 2017) (holding that WARN Defenses were inapplicable because no written WARN notice was given); *Graphic Communications, International Local v. Bureau of Engraving*, 2003 WL 21639146 (D. Minn. July 7, 2003) (holding WARN defense inapplicable because of the employer's failure to provide notice that met the statutory requirements); *United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F.Supp. 426, 440 (D. Mass. 1995) (indicating in dicta that defendants "failed to provide any written notification" and "that this failure alone would constitute sufficient grounds to deny the applicability of the [WARN Act's] exemption provisions."); *Childress, et al. v. Darby Lumber Inc*., *et al*. 126 F. Supp. 2d 1310, 1317 (D. Mont. 2001) *affirmed*, 357 F.3d 1000 (9th Cir. 2004) (defendant "would still be liable [under the WARN Act] even if any of the exceptions applied because its notice was inadequate"); *Organogenesis, Inc. v. Andrews*, 331 B.R. 500, 502 (D. Mass. 2005) ("An employer who wants to reduce the notification period must comply with the clear statutory requirement that the termination notice contain an explanation for the shortened time."); *In re Organogenesis, Inc. v. Andrews,* 316 B.R. 574, 584-585 (Bankr. D. Mass. 2005) ("The Debtor has

admitted its failure to give any written notice whatsoever under the WARN Act to the Claimants. It cannot rely on the asserted defenses that require an employer to have given *reduced* notice as soon as practicable"; FN 11: "Even assuming without deciding that the September 20, 2002 memorandum notifying the Debtor's employees of their termination contained the elements of notice required by 20 C.F.R. § 639.7, it nonetheless fails to provide WARN Act notice. The memorandum failed to follow the mandate of 20 C.F.R. § 639.9, requiring a brief explanation for reduction of the 60-day notice period. This failure alone is grounds to find that the memorandum does not provide sufficient notice."); *In re Quantegy, Inc.*, 343 B.R. 689, 695-96 (Bankr. D. Ala. 2006) ("Because the notice provided by Quantegy did not contain a brief statement of the basis for reducing the notice period, Quantegy is not entitled to rely on the defenses provided by the statute, and the plaintiffs are entitled to summary judgment on that issue."); *Grimmer, et al. v. Lord Day & Lord, et al.*, 937 F. Supp. 255, 257 (S.D.N.Y. 1996) (shortened notice allowed by § 2102(b) can <u>only</u> be invoked by an employer if the employer gives its employees the "reduced" notice as provided in § 2102 (b)(3) and 20 C.F.R. 639.9, including the specific facts that constitute the basis for reducing the notice period; "[s]uch a requirement focuses employers on the statutory conditions that must be met to reduce the notice period by prohibiting employers from relying on a vague justification for giving shortened notice. If an employer must set forth specific facts in its notice in order to rely on a statutory exception, it is more difficult for one who does not truly qualify for the exception to invoke it."); *Alarcon v. Keller Indus.*, 27 F.3d 386, 390 (9th Cir. 1994) ("the company must give some indication of the factual circumstances that made an exception to the statutory notice requirement applicable, providing an adequate, specific explanation to affected workers");  *Newman v. Crane*, 435 F. Supp. 3d 834, 843 (N.D. Ill. 2020) ("Courts to consider the issue appear to have uniformly held that giving proper shortened notice is a prerequisite to invoking one of the statutory exceptions."); *Chaney v. Vermont*

17

*Bread Co.*, No. 2:21-CV-120, 2023 U.S. LEXIS 148066, at *31 (D. Vt. Aug. 24, 2023) ("Here, with no mention of fraud or surprise in the notices of closure, employees had no opportunity to determine whether, on that basis, the absence of prior notice was reasonable. Consequently, the employer's failure to set forth the statutorily-required "brief statement of [that] basis for reducing the notification period," 29 U.S.C. § 2102(b)(3), disqualifies it from protection under the 'unforeseen business circumstance' exception."); *In re Dewey & LeBoeuf LLP*, 507 B.R. 522, 533 (Bankr. S.D.N.Y. 2014) (granting partial summary judgment striking the UBC Defense because the employers written notices did not contain a brief statement of the basis for reducing the notice period --"even under dire circumstances, employers must deliver written WARN notices containing the necessary brief statements to qualify for the WARN Exceptions").

Further, as the regulations emphasize, "[a]ll notice must be specific." 20 C.F.R. § 639.7(a)(1). The same applies to the brief statement. It must:

> [S]et forth the underlying factual events which led to the shortened period[.] … [I]t is not enough for an employer simply to cite a statutory exception, stating, for example, 'the notice is short because we are a faltering company.' Such a statement provides no understanding of the underlying conditions or state of affairs causing the shortened notice, and it lacks any semblance of specificity or detail. Instead, the company must give some indication of the factual circumstances that made an exception to the statutory notice requirement applicable, providing an adequate, specific explanation to affected workers. Further, an employer omits vital information at its peril from the notice. If the stated basis for the shortened notice is later determined not to be the cause of the shortened notice, the notice may be found inadequate.

*Childress,* 126 F. Supp. 2d  at 1317-8.

Vague or generic explanations fail the statutory requirement and deprive the employer of the defense in litigation. In *Grimmer,* 937 F. Supp. at 255-257, the employer gave a few weeks' notice and, to justify the failure to give more, invoked the UBC and faltering company defenses. The court

struck the defenses based on the language of the notice, which stated that: "The Firm was not able to give greater advance notice of this termination since this termination arises from unforeseeable business circumstances." *Id.* at 256. That was woefully inadequate to qualify for the defense, as the court explained: "[i]f an employer could comply with § 2102(b)(3) by simply parroting a statutory exception, this section of the statute would serve no purpose." *Id.* at 257. Rather, "Congress indicated that it intended something more[,]" namely, "the specific facts that constitute the basis for reducing the notice period" *Id.* at 257. The requirement for specific facts "focuses employers on the statutory conditions that must be met to reduce the notice period by prohibiting employers from relying on a vague justification for giving shortened notice." *Id.* It "makes it more likely that employees will receive the full sixty-day notice period in the majority of cases in which the statutory exceptions do not apply. *Id.* The employer's generic notice meant that it "may not rely on the exceptions to the sixty-day notice requirement." *Id.*

As in *Childress* and *Grimmer*, courts, including this one, find defendants ineligible for the defenses where their notice does not provide factual specificity. *See*, *e.g.*, *D'Amico v. Tweeter Opco, LLC (In re Tweeter Opco, LLC*, 453 B.R. 534, 546-47 (Bankr. D. Del. 2011)(notice inadequate where it stated "due to adverse business conditions outside our control, we are not able to give you advance notice" and "[a]s a result of our bankruptcy filing and the elimination of some services to our costumers [sic], today we are conducting a significant reduction in our workforce").

Importantly, it is *not* enough for the WARN Act notice to simply refer to the allegedly applicable reduced-notice provision by citation or nickname; the notice must contain *facts* showing that the reduced-notice provision is applicable. *See*, *e.g.*, *Fleming v. Bayou Steel BD Holdings II LLC*, No. 20-1476, 2022 U.S. Dist. LEXIS 15629 (E.D. La. Jan. 28, 2022) (notice inadequate where it stated closing was "[b]ecause of unforeseen business circumstances and the inability to secure

19

necessary capital" which court held "fail[ed] to give any reason why, besides the language of the statute…Bayou Steel is closing, let alone explain why giving sixty days' notice was not possible"; employer was precluded from invoking the reduced-notice provisions);[7] *Newman v. Crane*, 435 F. Supp. at 842-44. This is settled law.

Here, as to the non-bargaining-unit employees, the Debtors undisputedly did not comply with this command. The belated form "notice" that had to be accessed in Oracle is Doc. 2582-1. Statlander Declaration, Doc. 2582, ¶¶ 7, 10; See, Exhibit 1, EPIQ General FAQs excerpt (No. 12: "How do I review and sign my Severance Agreement? Following the termination of your employment, you will be able to access relevant documents including your Notice of Separation & General Release of Claims (Severance Agreement), benefits information and IT information via Oracle.") The belated form "notice" contains literally no factual statements as to any reason why notice could not have been given earlier. It merely invokes WARN Act exceptions by nickname, though it is well-settled, as shown above, that this is legally inadequate. The Declaration of Darren Hawkins in Support of Debtors' Third, Fourth, And Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability (Doc. 2581, "Hawkins Declaration" at ¶ 110), also shows that any after-the-fact, purported notice to non-bargaining-unit employees did nothing but invoke, by nickname, some WARN Act exceptions. (Hawkins says, *id.*, that the notice to *union-represented employees* included additional verbiage; Hawkins makes no such assertion with regard to any purported notice to non-bargaining unit employees). Therefore, as shown herein, and certainly with regard to the putative Class members who Plaintiffs seek to represent, the Debtors are categorically barred from invoking the "unforeseeable business circumstance" and "faltering company" defenses.

---

[7] The District Court in *Bayou Steel* subsequently entered summary judgment for the defendants on other grounds, and the Fifth Circuit reversed in part. *Fleming v. Bayou Steel Bd. Holdings II L.L.C.*,

Debtors try to evade this result by pointing to company-wide emails lambasting the Teamsters and saying how important "One Yellow" was, as though those emails could stand in for the required "brief statement" in a WARN Act notice. But those emails – starting several weeks before the shutdown – did not discuss the supposedly "unforeseeable business circumstance" that Debtors invoke. That is, the supposedly "unforeseeable business circumstance" was not tough negotiations with the Teamsters. Instead, the supposedly "unforeseeable business circumstance" was much more particular: the July 17 **strike threat**. (*See*, *e.g.*, Objection p. 32 ("The WARN Acts Do Not Require Yellow To Provide Earlier Notice Because Unforeseeable Business Circumstances— The IBT's Strike Threat—Caused The Layoffs."). The mass emails to employees in June and July said nothing about any strike threat. Therefore, even if those mass emails could be considered as a potential source of the required "brief statement" of the unforeseeable business circumstance, those mass emails simply do not contain such a thing.

Moreover, even if Debtors were not categorically barred from relying on the "faltering company" and "unforeseeable business circumstance" defenses, those defenses are inapplicable here on the facts. At the very least, there are genuine issues of fact about that, which cannot be resolved on this paper record. Again, the burden of proof as to these matters is on the employer. See, e.g., *Varela v. Burtch (In re AE Liquidation, Inc.)*, 556 B.R. 609, 617 (D. Del. 2016).

Take, first, the "faltering company" defense, 29 U.S.C. § 2102(b)(1) ("An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the

83 F.4th 278 (5th Cir. 2023).

employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.").

Debtors say that the One Yellow initiative itself was a way of "actively seeking capital" within the meaning of this provision, but it is not. Debtors hang their hat on a passage in *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 249 (3d Cir. 2008), quoting a Department of Labor WARN Act regulation: "The DOL regulations provide that 'actively seeking' means 'seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method.' 20 C.F.R. § 639.9(a)(1)." Debtors seek to stretch the meaning of the phrase "internally generated financing" to include an employer's efforts to change some things within its own business operations to save money. But that is not what the statute, or the regulation, cover. The regulation begins with the requirement that the employer must be "seeking financing or refinancing" – things that are categorically different from internal cost-cutting measures. The regulation goes on to speak of type of "seeking financing" – i.e., "the issuance of stocks, bonds, or other methods of internally generated financing." Thus "other methods of internally generated financing" must be things bearing some material similarity to the issuance of stocks or bonds. This is the interpretive canon of *ejusdem generis*. "Under ejusdem generis, 'when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.'" *United States v. M. M*., 23 F.4th 216, 220-21 (3d Cir. 2021), quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129, 111 S. Ct. 1156, 113 L. Ed. 2d 95 (1991). Moreover, this exception "should be narrowly construed." 20 C.F.R. § 639.9(a).

Debtors also say that they were actively seeking financing or refinancing through lenders, sixty days in advance of the shutdown; they offer this, too, to satisfy the "faltering business" exception. But as to this – and it applies equally to the invocation of "One Yellow" in this regard – the Debtors fail to meet their burden of proof on the exception. That is, one of the things that an employer must prove is that "the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." 29 U.S.C. § 2102(b)(3). That is a requirement of proof that the employer "believed" that giving WARN Act notice, sixty days before the shutdown, would have the consequences stated in the statute. This is a requirement of proof of state of mind; to "believe[]" something is a state of mind. *Al-Hasani v. Sec'y United States Dep't of Homeland Sec.*, 81 F.4th 291, 298 (3d Cir. 2023) ("beliefs … require inquiry into a person's subjective state of mind."). Under the statute, such a belief also has to be reasonable and in good faith, 29 U.S.C. § 2102(b)(1); but first of all, it has to be an actual belief.

And there is, here, no evidence that relevant corporate decisionmakers even *considered* giving WARN Act notice sixty days prior to the shutdown, much less than any relevant corporate decisionmakers actually harbored the *belief* – the conscious thought – that giving notice at that time would have precluded the Debtors from obtaining needed capital. For all that Debtors have shown, no one even considered giving WARN Act notice at all, at the pertinent time sixty days in advance of the shutdown. At best, what Debtors have argued is that *if they had* thought about giving WARN Act notice in late May, they would have reasonably believed it to be counterproductive; but that is not what the statute asks. For this reason, too, Debtors could not avail themselves of the "faltering company" defense – even if they had complied with WARN's prerequisites for invoking the defense in the first place,  (which, as shown above, they did not).

Moreover, Debtors have not shown that they would be entitled to judgment on the "unforeseeable business circumstance" defense – even if they were allowed to raise that defense (which, as shown above, they are not, because they did not give the required "brief statement."). There is, at least, a genuine issue of fact on this point. Debtors now tell this Court that "Yellow could not have expected (nor would any reasonable person have expected) that the IBT would deliberately end the careers of 22,000 unionized employees." (Objection, p. 8). They say "During the period in late May and early June when (in hindsight) notice would have been required, Yellow could not have foreseen that the IBT would decide to sacrifice Yellow along with 22,000 unionized jobs. Yellow did not consider this a 'possibility,' much less the legally required 'probability.'" (*Id.*, p. 34).

But in contrast to what Debtors say now, consider what various Yellow entities told the United States District Court for the District of Kansas, in a Complaint filed more than a month before the shutdown. (Exhibit 2, attached – June 27, 2023, Complaint in No. 6:23-cv-01131-JAR-ADM (D. Kan.)). The Complaint stated that the Teamsters were in breach of the collective bargaining agreement, and that "If not cured immediately, these breaches will also result in the liquidation of the Company, the loss of 22,000 Teamsters jobs, higher transportation costs in a less competitive freight shipping market, and severe harm to the United States supply chain and economy, as well as wipe out all of the equity value of Yellow's shareholders, including the United States Treasury, Yellow's single largest shareholder." (p. 2 ¶ 1). "Beginning about eight months ago, the Union, at the direction of Sean O'Brien and in breach of its collective bargaining agreement with Yellow, has steadfastly refused to resolve the seniority issues arising from Phase 2—even though the Union and Mr. O'Brien know that obstructing One Yellow would financially destroy the Company, put 30,000 employees, including 22,000 Teamsters, out of work, and badly disrupt the country's supply chain." (*Id.*, p. 3 ¶ 6).

24

Notwithstanding Yellow's repeated approaches to the Union and Mr. O'Brien to meet and negotiate, and its repeated offers to accommodate the Union's purported demands, Mr. O'Brien has refused to permit any cooperation or negotiations, choosing instead to direct profanities at Yellow and its executives and even to gloat at Yellow's impending demise. In fact, for his own inexplicable reasons, political or otherwise—reasons that could not possibly be in the interests of Union members, let alone the country—**Mr. O'Brien has made clear that he wants to bring about Yellow's demise.**

(*Id.*, ¶ 7 (emphasis supplied)). "Mr. O'Brien sees his calling, not as advancing Union members' interests lawfully, but instead, as described by a recent Washington Post profile, seizing a 'once-in-a-generation opportunity to push back' against management in corporate America, whom he routinely refers to as 'white collar criminals.' In that crusade, not only is Yellow a principal target, but its 30,000 employees, including 22,000 Teamsters, and their families are mere collateral damage." (*Id.*, ¶ 8).

Despite his obligations as President of the Union to its members, Mr. O'Brien plainly does not care about the 22,000 Yellow IBT employees whose jobs now hang in the balance as a result of the Union's contractual breaches, nor does he care about the damage he will cause to America's supply chains and the economy, or the higher consumer prices that will result from loss of competition in LTL freight shipping. He and the Union are focused instead on the bigger prizes of negotiating with UPS and unionizing Amazon. **Indeed, Mr. O'Brien has said, "Yellow has shown that it doesn't deserve and cannot be expected to continue under its current structure," and that he does not care about Yellow or its survival.**

(*Id.*, p. 10 ¶ 29 (emphasis supplied)).

By stonewalling Yellow's implementation of Phase 2, **the Union has knowingly and intentionally triggered a death spiral for Yellow**. The harm it has caused and continues to cause Yellow was foreseeable and serious, and the Union has failed and continues to fail to take any reasonable precautions to protect Yellow's economic interests. Indeed, far from taking any reasonable precautions, such as by following the contractually subscribed CHOPS process, or acting with the urgency this situation demands, **the Union has acted and is acting in a manner deliberately intended to injure Yellow**.

(*Id.*, p. 12 ¶ 34 (emphasis supplied)).

25

The Yellow entities' Complaint told the Kansas District Court that they understood Mr. O'Brien, and the Teamsters, to be threatening a strike as early as February 2023. (*Id.*, p. 34 ¶ 131).

And their Complaint further recounts how Yellow told the Teamsters, in early May, that the companies might not survive through July if the Teamsters continued to be (in the companies' view) intransigent. (*Id.*, p. 44, ¶ 172 ("waiting until August to commence bargaining will not work under the circumstances as Yellow may not exist if we wait until then to start.").

In light of these statements – which are evidentiary admissions – there are genuine disputes of fact regarding the foreseeability of the strike threat, regarding Debtors' beliefs about the Teamsters' intentions, regarding Debtors' beliefs about their ability to survive past July 31, and other matters going to the "unforeseeable business circumstance" defense. But, as discussed above, the Court should not even reach the substance of this defense because of Debtors' failure to provide the required "brief statement" in a WARN Act notice.

### 3.    DEBTORS HAVE NOT SHOWN "GOOD FAITH" AND RELIEF SHOULD NOT BE REDUCED ON THAT BASIS.

Debtors, seeking to reduce the remedy in case they are found liable for violating the WARN Act, invoke 29 U.S.C. § 2104(a)(4) ("If an employer which has violated this Act proves to the satisfaction of the court that the act or omission that violated this Act was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Act the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section."). But Debtors have not proven that they come within that provision, and they clearly do not.

"The good faith defense requires proof of the employer's subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act. …

26

[T]he employer … bears the burden of proof as to this mitigation defense." *Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 730 (7th Cir. 2004).

As to the subjective prong, Debtors have not provided evidence that they actually *believed* – either sixty days before closing, or at the time of closing – that they were complying with the WARN Act. Debtors cite no evidence that they even thought about the WARN Act, sixty days before closing; they have not proven that they considered giving notice sixty days in advance, much less that they believed in good faith that they did not need to.

Nor do Debtors cite any evidence that they actually *believed* at the time of closing that an after-the-fact notice would comply with the Act, much less where it failed to include any "brief statement" (§ 2102(b)(3)) of the reasons why notice could not have been given sooner. Debtors have, furthermore, not shown that any lawyer told them that such a notice was permissible under the WARN Act, in timing or content--where it merely invoked WARN Act exceptions by nickname and provided no factual support at all. "Good faith requires an honest intent to ascertain the requirements of the statute and to act accordingly." *Barnett v. Jamesway Corp. (In re Jamesway Corp.)*, 235 B.R. 329, 346 (Bankr. S.D.N.Y. 1999), quoting *Washington v. Aircap Indus.*, 860 F. Supp. 307, 315-16 (D.S.C. 1994).

As to the objective prong, there was and is no "reasonable grounds for believing" (§ 2104(a)(4)) that an employer complies with the WARN Act by terminating employees with no advance notice and failing to include the factual statement required by § 2102(b)(3). As discussed above, it is well-settled that (1) an employer violates the "brief statement" requirement of § 2102(b)(3) by merely invoking WARN Act exceptions by nickname, and (2) an employer that fails in that way *has no defense*. There were no reasonable grounds for thinking otherwise. And again, Debtors have not even claimed that they got legal advice that such a thing was permissible.

27

*Jamesway*, *supra*, is instructive here. In *Jamesway*, as here, the employer forfeited any potential WARN Act exceptions by not complying with § 2102(b)(3). *Jamesway*, 235 B.R. at 339-43. The Court further refused to reduce the remedy for "good faith." *Id.* at 345. The employer had "adduced no evidence … to prove to that it had a good faith belief that" its communications "satisfied [its WARN Act] obligations." *Id.* The employer had, furthermore, provided no evidence of any advice by counsel that its communications were in compliance with the Act. *Id.* at 345, n.14. "Moreover, the circumstantial evidence supports the conclusion that Jamesway did not have a subjective belief that it was in compliance with the Act. As we have determined, Jamesway was aware of its WARN notice obligations prior to it terminating any of the plaintiffs, and it was capable of providing WARN notice but failed to do so." *Id.* at 346. (The same is true here: Debtors were aware of the WARN Act and capable of complying, as shown by the fact that they prepared what purported to be a WARN Act notice with no advance warning, but it failed to provide the information required.) Indeed, the Court in *Jamesway* concluded that even if the employer received unwritten legal advice that led it to believe that its actions were in compliance, that belief would have been "clearly unreasonable." *Id.* at 346-47.

The same is true in this case. There is no evidence that Debtors actually believed that they complied with the WARN Act; and such a belief would have been objectively unreasonable.

As will be discussed in the next section below – when dealing with the issue of releases – Debtors' conduct in this regard not only reflected an absence of affirmative good faith. Beyond that, in their no-advance-notice communications to non-bargaining-unit employees, Debtors acted in clear bad faith. Debtors *told* the employees that Debtors were in compliance with the WARN Act based on the "unforeseeable business circumstance" and "faltering company" defenses, even while Debtors were clearly forfeiting those defenses through a failure to comply with the prerequisites to invoke the

defenses, as shown herein. This was, one can infer, a counseled decision on Debtors' part; one can infer that counsel was involved, because the communication to non-bargaining-unit employees also asked them to sign a lengthy and obviously lawyer-drafted release. The best inference is that the failure to include a "brief statement" was strategic, and most likely done in order to enhance the likelihood that employees would accept at face value that they had no WARN Act claims and would sign them away.

In any event, whether that was the cynical plan or whether instead the failure to include a "brief statement" was done for some other reason, there is no reasonable basis for believing that Debtors complied with the WARN Act. Nor is there evidence that they actually thought in subjective good faith that they were complying with the Act by giving non-bargaining-unit employees patently deficient notice with no advance warning whatsoever.

4.   **THE RELEASE, INCLUDED IN THE SAME DOCUMENT AS THE MISLEADING AND LEGALLY INVALID BELATED TERMINATION NOTICE, IS VOID AND UNENFORCEABLE.**

Finally, Debtors argue that non-bargaining-unit employees cannot recover, where they electronically signed the "release" that was included in the same document as the no-advance-warning WARN Act "notice" (Doc. 2582-1).

As an initial matter, the payments required by the New Jersey WARN Act may not be waived absent approval of the waiver by the NJ Commissioner of Labor and Workforce Development or court of competent jurisdiction.  See, N.J. Stat. § 34:21-2 (e) ("No waiver of the right to severance provided pursuant to this section shall be effective without approval of the waiver by the commissioner or a court of competent jurisdiction.").  Debtors do not even suggest in the Objection that they received administrative or judicial approval of the form "releases" that were secured from Debtors' NJ employees and which purport to release claims under the New Jersey WARN Act.

29

Thus, such releases are unenforceable with regard to the NJ employees as a matter of law. Even if Debtors attempt to seek some after-the-fact judicial approval of the form releases, such attempts should be rejected. Debtors cannot show that their belated, false and non-negotiable cookie cutter releases should be enforced against any of their former non-bargaining unit employees, much less the ones covered by the NJ WARN Act.

Plaintiffs submit that the best way to handle the "release" issue is to decide it in due course in the class action adversary proceeding. The issue has been partially addressed in the briefing on class certification in that adversary proceeding; and that adversary proceeding provides the best mechanism for addressing the issue once and for all.

In short, and in addition to the explicit prohibition of unapproved releases as set out in the NJ WARN Act, the form "release" in this case should be held null and void across the board, based on public policy. In a nutshell, the Debtors' single document which combined the form "release" with the misleading belated notice was a subterfuge that is contrary to the text and purpose of the WARN Act itself. If the Debtors' releases were given effect in this case, it would give a green light to every employer to inoculate itself against WARN Act liability.

The text of the WARN Act states the permissible legal effect, on WARN Act claims, of monetary payments by the employer to the terminated employees in connection with the plant closing or mass layoff that triggered the Act: such payments can *reduce* WARN Act liability, but only if the payments are *unconditional*. 29 U.S.C. § 2104(a)(2) ("The amount for which an employer is liable under paragraph (1) shall be reduced by- … (B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation").

Here, Debtors are trying to do something very different and worse, and something not allowed by the statute: to *eliminate* (not "reduce[]") their WARN Act liability by means of a very

*conditional* (not "unconditional") payment. Allowing this ploy to succeed would be contrary to the text and purpose of the WARN Act; it would violate the public policy enshrined in the Act. It would, if allowed, mean that every unscrupulous employer could do the same – to offer employees, in bulk, much less than they are owed under the Act at the very time the employees are (by virtue of the employer's unlawful action) put in financial jeopardy by the unexpected loss of their livelihood – and thereby make the WARN Act toothless.

Moreover, the inequity and wrongfulness of such a ploy was compounded in this case by the particular facts.

(1) The belated purported WARN Act notice gave the employees a slam-dunk case for WARN Act liability, wherein Debtors waived any defenses by failing to provide the statement of reasons required by § 2102(b)(3).

(2) But that same document falsely told the employees that the Debtors were not violating the WARN Act. Indeed, it falsely asserted that there was doubt as to whether the WARN Act even applied, and falsely told the employees that same-day notice was acceptable because Debtors qualified for WARN Act exceptions, when in fact Debtors had waived those exceptions in the very same document. (Doc. 2582-1 ("The Company does not admit that such laws apply or that notice is required. If no obligations exist, this notice is being provided to you voluntarily. The Company was not able to provide earlier notice of the Shut Down as it qualifies under the 'unforeseeable business circumstances,' 'faltering company,' and 'liquidating fiduciary' exceptions set forth in the WARN Acts.")).

(3) The release was included in the very same document – thus hitting the employees just after they learned that their lives were disrupted without advance notice and that their economic futures were in peril. (Doc. 2582-1).

31

(4) The severance payments offered in exchange for the release were substantially less than the pay and benefits due under the federal and state WARN Acts that are the remedy for the slam-dunk WARN Act case that Debtors created by their own actions. Employees with less than 10 years' service got only two weeks' severance. Employees with more than 10 years' service got only a quarter of a week per year of service, with a maximum of six weeks (still substantially less than the WARN Act remedy, even for an employee who had faithfully served Debtors for decades). Only those at the level of Vice President or above got severance of 13 weeks which may or may not have satisfied the WARN wage provisions under state law but made no provision for the benefits portion of WARN damages. (*Id.*, p. 3).

(5) Employees were informed that the offer was non-negotiable – take it or leave it – and the "release" lacks any suggestion that the employees were advised to seek counsel. See, Exhibit 1, EPIQ General FAQs excerpt ("No. 13.  Is the Severance Agreement Negotiable?  The Severance Agreement is non-negotiable."); (Doc. 2582-1)

Thus, this case is nothing like the cases upon which Debtors rely in their superficial argument that WARN Act claims can be released.

Debtors' main authority, *Ellis v. DHL Express Inc. (USA)*, 633 F.3d 522 (7th Cir. 2011), is very different from this case. The "releases" at issue there were part of optional severance agreements, for employees who chose to resign in the face of looming closures. *Id.* at 523-24. The plaintiffs in *Ellis* wanted to count those employees – who had resigned and signed releases in exchange for severance benefits – towards the numbers required to make out a "plant closing" or "mass layoff" under the WARN Act. *Id.* at 525. The question was whether those resignations were "voluntary" within the meaning of the WARN Act's provision that "excludes 'voluntary departure[s]' from its definition of 'employment loss[es]' that trigger its notification requirements.

32

29 U.S.C. § 2101(a)(6)." *Ellis*, at 526. The Court cited, and followed, regulatory guidance that employees who take severance offers in the face of a looming closure will be deemed to have voluntarily departed, absent undue pressure or coercion. *Id.* at 526-27. In applying that rule to the facts in *Ellis*, the Court expressly noted that the question of voluntariness included an inquiry into whether the choice was "free from fraud or other misconduct," *id.* at 527; and that there was no evidence in *Ellis* that "the workers were given incomplete information," *id.* The Court also noted that the agreements had been negotiated by the union, and that the agreements advised the employees to seek legal counsel before signing. *Id.* It was in that context that the Court held, "we maintain our previous stance that WARN Act claims can be waived as part of a voluntarily signed general release."[8] This statement was unnecessary, because the validity of releases was not the point in *Ellis*; the point, instead, was that many employees had voluntarily resigned. But *Ellis* is nothing like this case, as *Ellis* involved union-negotiated releases, as to which employees were given complete information with nothing misleading – and were advised to seek legal counsel before signing.

Debtors next cite *Int'l Ass'n of Machinists & Aero. Workers v. Compania Mexicana De Aviacion*, 199 F.3d 796 (5th Cir. 2000). That case, too, involved a severance package and release negotiated by the employees' union, in advance of a looming shutdown. The Court noted that a release can be invalid if procured through such things as fraud or duress, but held "There is no evidence that the releases were obtained by fraud, duress or material mistake, and therefore the elements of a valid release are satisfied." *Id.* at 799.

---

[8] For that proposition, the Court in *Ellis* cited Hardy v. Chi. Hous. Auth., 189 F. App'x 510 (7th Cir. 2006). But *Hardy*, too, is nothing like the present case. In *Hardy*, the plaintiffs' union had signed a general release under which represented employees released all claims, in settlement of unfair labor practice charges. Years later, some of the employees brought a WARN Act suit. The court held that the general release, negotiated by the union and binding on employees, barred the WARN Act claims. That holding sheds no light at all on the present case.

Debtors also cite *Williams v. Phillips Petroleum Co.*, 23 F.3d 930 (5th Cir. 1994), but again that case is fundamentally unlike this one. First, whereas plaintiffs in this case have a slam-dunk case given the absence of any advance notice and the absence of the "brief statement" required by § 2102(b)(3), the plaintiffs in *Williams* had no valid WARN Act claims. *Id.* at 933-35 ("original" plaintiffs were not part of a mass layoff, so they had no WARN Act claim); *id.* at 935 ("Bartlesville plaintiffs" had no valid WARN Act claim because they got sixty days' advance notice). Second, when offering the releases as an alternate ground for ruling against the plaintiffs, the Court noted that there was no evidence of fraud, that the employees had been given ample time (indeed up to 45 days) to decide whether to sign, that there was no evidence that the terms of the release were non-negotiable, and that the employees had been advised to seek legal counsel. *Id.* at 935-37.

Finally, Debtors cite *Drake v. U.S. Enrichment Corp.*, 63 F. Supp. 3d 721 (W.D. Ky. 2014), and describe it as "finding salaried employees' WARN Act claims were barred by severance agreement and general release executed at the time of termination." It is remarkable that Debtors ask this Court to rely on that case – because the only reason the Court gave for holding those employees' claims were barred by releases was that *the employees' lawyers did not respond to the argument* and so the Court held they had waived any opposition to the argument. *Id.* at 725. The case tells us nothing about how much those employees received in exchange for the release (or even whether the severance payments were possibly even *more* than the available WARN Act relief), whether they were given full and truthful information, how much time they were given to consider the proposal and whether they were told to seek legal advice, or anything else. Any reliance on this case would be misplaced.

In this case, the releases were quite simply an attempt to evade full responsibility for the blatant violation of the WARN Act that Debtors themselves created. The whole reason for the

WARN Act is that the unexpected loss of a livelihood, through no fault of the employees, is devastatingly disruptive to a person's well-being and economic life. The WARN Act seeks to avoid putting employees in this vulnerable state, by requiring advance notice (including advance notice to state and local government, so that they have time to help employees find new work before the shutdown of their existing workplace). And Congress carefully detailed a proper measure of monetary relief, when an employer violates the Act: Congress set the relief at the measure it thought best, both to compensate employees and (ex ante) to induce employers to comply.

Debtors' scheme was a fundamental betrayal of this statutory scheme. They blatantly violated the Act, putting tens of thousands out of work with no advance notice and no time for state and local governments to assist them in finding new work before they lost their jobs. Then, Debtors – in one combined document, offered when employees were suffering the very disruption that the Act sought to protect against – lied to the employees in saying that Debtors had not violated the Act, and offered the employees, at their most shocked and vulnerable moment, much less than the WARN Act entitled them to. The Court should recognize that this cynical, manipulative and misleading ploy to avoid clear WARN Act liability is contrary to the text and purpose of the Act, and is void as being against the public policy of the Act. A release that so undermines a federal law is void as being contrary to public policy. *See D. A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 116 (1946).

For all of the above reasons, the Objection should be denied and the Plaintiffs respectfully request that if this Court were to disallow any claims as requested in the Objection, the Court make clear that this is without prejudice to the right of any class member to recover in the WARN Action if the Court certifies it as a class action and if the class prevails.

Dated: April 4, 2024                     Respectfully submitted,

                                         By: /s/_____James E. Huggett_____
                                         **MARGOLIS EDELSTEIN**
                                         James E. Huggett (#3956)
                                         300 Delaware Avenue
                                         Suite 800
                                         Wilmington, DE 19801
                                         Phone 302-888-1112
                                         Fax 302-888-1119

                                         **THE GARDNER FIRM, P.C.**
                                         Mary E. Olsen (OLSEM4818)
                                         M. Vance McCrary (MCCRM4402)
                                         The Gardner Firm, P.C.
                                         182 St. Francis Street, Suite 103
                                         Mobile, AL 36602
                                         P: (251) 433-8100
                                         F: (251) 433-8181
                                         molsen@thegardnerfirm.com

                                         -and-

                                         **RAISNER ROUPINIAN LLP**
                                         René S. Roupinian, Esq.
                                         Jack A. Raisner, Esq.
                                         270 Madison Avenue, Suite 1801
                                         New York, NY 10016
                                         Telephone: (212) 221-1747
                                         Email: jar@raisnerroupinian.com
                                         Email: rsr@raisnerroupinian.com

                                         -and-

                                         **LANKENAU & MILLER, LLP**
                                         Stuart J. Miller
                                         Johnathan Miller
                                         100 Church Street
                                         8th Floor
                                         New York, NY 10007
                                         (212)581-5005
                                         stuart@lankmill.com
                                         jon@lankmill.com

                                         *Counsel for Plaintiffs and the Putative Class*